Richard S. Busch (SBN 319881)
richard.busch@arlaw.com
Mark L. Block (SBN 115457)
mark.block@arlaw.com
David Niemierzycki (*pro hac vice* forthcoming)
david.niemierzycki@arlaw.com
Andrew H. "Drew" Davis (*pro hac vice* forthcoming)
drew.davis@arlaw.com
ADAMS & REESE, LLP
1600 West End Ave., Suite 1400
Nashville, TN 37203
Tel: (615) 259-1450
Fax: (615) 259-1470

Jeffrey E. Faucette (SBN 193066)
jeff@skaggsfaucette.com
Martin R. Glick (SBN 40187)
marty@skaggsfaucette.com
SKAGGS FAUCETTE LLP
505 Montgomery Street, 11th Floor
San Francisco, CA 94111
Tel: (415) 874-3181
Fax: (888) 980- 6547

*Attorneys for Plaintiffs [listed on signature page]*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

ELVIS PRESLEY ENTERPRISES, LLC; ABG EPE IP LLC; THE LUIGI CREATORE TRUST AND CLAIRE CREATORE AND STEPHEN CHAPMAN AS TRUSTEES; THE SUSAN T. ABERBACH REVOCABLE TRUST AND SUSAN T. ABERBACH AS TRUSTEE; THE DECEDENTS EXEMPT TRUST CREATED UNDER THE ANNE-RACHEL ABERBACH FAMILY TRUST AND STEVEN LEE AS TRUSTEE; JASON SIMEON ABERBACH; ABILENE MUSIC LLC; KAREN ZIMMERMAN; JANICE MACDOWELL; HELENE KAYE; KAREN KAYE LEE; STEVEN BAUM; MELISSA FERRICK; LORI ZIMMERMAN; and RALEIGH MUSIC PUBLISHING LLC,

Plaintiffs,

v.

SUNO, INC,

Defendant.

Case Number: 3:26-cv-13398

**COMPLAINT FOR VIOLATION OF THE ELVIS ACT (TENN. CODE § 47-25-1101 ET SEQ.); TENNESSEE COMMON LAW RIGHT OF PUBLICITY; DIRECT COPYRIGHT INFRINGEMENT; CIRCUMVENTION OF PROTECTION MEASURES; AND REMOVAL OR ALTERATION OF CMI**

**DEMAND FOR JURY TRIAL**

## INTRODUCTION

1. **The *image* is one thing and the human being is another … it's very hard to live up to an image.** - Elvis Presley

2. The difficulty in creating, maintaining, and living up to an image like Elvis Presley's cannot be overstated, accurately described, nor fully comprehended. Elvis took on an entire system, and navigated international moral panic and cultural backlash for doing things no one had ever done before. Only Elvis himself knew what it took: the price of true greatness, built up and distilled down to an *image*, a concept beyond Elvis Presley the human being. Elvis' name, his face, and his voice are priceless, as are those rights for other artists. That is why the State of Tennessee specifically acted to protect the name, image, voice, and likeness of artists from the AI companies that would disrespect and disregard those rights, and why it named its statute the ELVIS Act, after actually asking the Elvis rightsholders for permission to do so, as discussed further below, something Defendant Suno, Inc., ("Suno" or "Defendant") does not know how to do.

3. Suno is the embodiment of why the ELVIS Act (Ensuring Likeness, Voice, and Image Security) was so essentially required. All of the humanity, history, despair, and triumph that constitutes Elvis' identity was stolen and is stored on servers and harnessed by Suno to make massive amounts of money, despite Suno being there for none of what it took to create, maintain, or attempt to live up to this image, and without license, permission, or payment. Suno did so intentionally, maliciously, and fraudulently to financially benefit itself and artificially compete with Elvis' likeness and copyrights, and continues to do so to this day. As shown below, Suno has stolen Elvis' voice, his image, and likeness (his "likeness" or "NIL"), as well as his copyrighted works on, literally, a breathtaking scale, and must now be called to answer for its theft.

4. Elvis Presley "permanently changed the face of American popular culture" and "was a symbol to people the world over…." - Jimmy Carter, Statement by the President on the Death of Elvis Presley.[1] "It's rare when an artist's talent can touch an entire generation of people. It's even rarer when that same influence affects several generations. Elvis made an imprint on the world of pop

---

[1] Online by Gerhard Peters and John T. Woolley, The American Presidency Project https://www.presidency.ucsb.edu/node/243942

music unequaled by any other single performer." - Dick Clark.[2] Elvis' influence stretches from early musical pioneers Buddy Holly and The Beatles[3] to today's and tomorrow's hitmakers such as Post Malone, and Bruno Mars (who originally came to prominence as "Little Elvis" as a four-year-old Elvis impersonator),[4] as well as most everyone in between.[5] Just last week global music star Harry Styles dressed up as the King for 'Harryween' at his sold-out show at Madison Square Garden in New York City.[6] Elvis the human being may have passed away nearly 50 years ago, but the King lives on forever.

5. Elvis' "twenty-three year career as a recording star, concert entertainer and motion picture idol brought him international recognition and a devoted following in all parts of the nation and the world[,]" *State ex rel. Elvis Presley Int'l Mem'l Found. v. Crowell*, 733 S.W.2d 89, 92 (Tenn. Ct. App. 1987), and this global sphere of influence made the use of his image and his likeness extremely valuable both during his life, and after his untimely passing in 1977.

---

[2] https://www.graceland.com/quotes-about-elvis

[3] "Without Elvis, none of us would have made it." – **Buddy Holly**
"If there hadn't been an Elvis, there wouldn't have been The Beatles." – **John Lennon**
https://www.graceland.com/quotes-about-elvis

[4] "I have a tat of Elvis on my finger along with John Lennon and Jim Morrison. If it wasn't for these guys I would not be making music right now." - **Post Malone**
https://www.graceland.com/quotes-about-elvis

"In 1990, [**Bruno Mars**] made his first appearance in the media: an article in the New York Times that presented him as 'Little Elvis'[.]" https://vocal.media/beat/from-little-elvis-impersonator-to-multi-grammy-winner-the-story-of-bruno-mars. "Mars began performing five days a week … at age four, … and became known in Hawaii for his onstage impersonation of Elvis Presley. … His Elvis impersonations had a major impact on his musical evolution and performing technique."
https://en.wikipedia.org/wiki/Bruno_Mars.

[5] "That's my idol, Elvis Presley." – **Eddie Murphy**
"From the blues artists to Elvis Presley, they have all had a major influence on my music." – **Justin Timberlake**
"I learned music listening to Elvis' records. His measurable effect on culture and music was even greater in England than in the States." - **Mick Fleetwood**
"Ask anyone. If it hadn't been for Elvis, I don't know where popular music would be. He was the one that started it all off, and he was definitely the start of it for me." - **Elton John**
https://www.graceland.com/quotes-about-elvis

[6] https://people.com/harry-styles-harryween-elvis-costume-new-york-night-1-photos-12197277

6. "As early as 1956, Elvis Presley's name and likeness could be found on bubble gum cards, clothing, jewelry and numerous other items. The sale of Elvis Presley memorabilia has been described as the greatest barrage of merchandise ever aimed at the teenage set. It earned millions of dollars for Elvis Presley, his licensees and business associates." *Id*.

7. In 1987, ten years after his death, marketing and licensing his NIL brought in "approximately fifty million dollars each year and provide[d] the Presley estate with approximately $4.6 million in annual revenue" (approximately $148,301,056 and $13,643,697 annually, respectively, when adjusted for inflation). *Id*.

8. As a result of his stature, the use of Elvis' NIL became exceedingly sought after by companies and individuals the world over for their own pecuniary gain and exposure, particularly after his passing at his Graceland home in Memphis, Tennessee.

9. So much so that the volume of unauthorized uses of Elvis' likeness, coupled with those infringers' 'free-for-all' rationale that one's likeness rights enter the public domain after death, spurred two branches of Tennessee's government to respond: the Tennessee Legislature made Tennessee one of the first states to legislatively recognize posthumous publicity rights by statute through "The Personal Rights Protection Act of 1984" ("PRPA"), and the judiciary recognized Tennessee's common law right of publicity and its extension beyond an individual's death. *Id*. at 99.

10. Suno displays the same 'free-for-all' mentality that precipitated Tennessee's recognition of the protections under the right of publicity. Nonetheless, three days ago on November 3, 2026, in another case against it for violations of various artists' rights of publicity, Suno stated in its motion to dismiss: **"by design and in practice, Suno outputs do not … reprise specific melodies from songs someone else wrote; and they do not replicate the auditory characteristics of any real artist's voice to the point that someone would confuse a Suno creation with one actually sung by a particular famous musician[,]"** ***Isbell, et al. v. Suno, Inc., et al.*****, 1:26-cv-14005, ECF 30, at 1, 4 (D. Mass) (Suno's Memorandum in Support of Motion to Dismiss),** and further: **"Suno 'has never allowed prompts for specific artists or copyrighted songs.'"** ***Id.*** **at 4 (quoting Mikey Shulman,** ***How We're Building the Future of Music Responsibly*****, Suno (Aug. 6, 2026), https://suno.com/blog/building-the-future-of-music-responsibly).**

11. These statements are unequivocally false, and Plaintiffs have concrete proof of the exact opposite of Suno's claims. In the attached Exhibit A, Plaintiffs provide five recorded examples of Suno directly infringing both Elvis' NIL and The Elvis Plaintiffs'[7] copyrights. (**Exhibit A**: https://vimeo.com/share/folder/d07b9029-4949-42d0-b97b-8ae977147ed9?fl=tl&fe=sl) (*See, e.g.*, Exh. A-1 'Elvis Presley - Blue Suede Sin Medley' Suno Output, wherein Suno infringes Elvis' NIL simultaneously with its infringement of the Elvis Plaintiffs' copyrighted Work 'Can't Help Falling in Love'; 'All Shook Up'; and 'Don't be Cruel').

12. In the attached Exhibits B and C, Plaintiffs provide 33 recorded examples of Suno directly infringing Elvis' NIL. (**Exhibit B**: https://vimeo.com/share/folder/0ddbd344-42c2-4697-826a-f260ba64c43c?fl=tl&fe=sl); (**Exhibit C**: https://vimeo.com/share/folder/39f936f4-084d-4579-94e0-8cca5cf3c455?fl=tl&fe=sl). (*See, e.g.*, Exh. B-2 'Elvis in The Jailhouse Rock', wherein Suno infringes Elvis' NIL in output which, at the time of this writing, is still live on Suno with over 125,000 plays).

13. In the attached Exhibit D, the Elvis Plaintiffs provide nine recorded examples of Suno directly infringing the Elvis Plaintiffs' copyrights. (**Exhibit D**: https://vimeo.com/share/folder/2f0723fc-af54-488e-9809-7e3b71bd96a3?fl=tl&fe=sl) (*See, e.g.*, Exhs. D-5 – D-9, infringing Suno outputs of Elvis Plaintiffs' copyrighted Work 'If I Can Dream').

14. Finally, in the attached Exhibit E, the Raleigh Plaintiffs[8] provide three recorded examples of Suno directly infringing the Raleigh Plaintiffs' copyrights. (**Exhibit E**: https://vimeo.com/share/folder/7245dc67-54b3-455e-8c78-4e2608f30990?fl=tl&fe=sl) (*See, e.g.*, Exh. E-3 'Through the Valley').

15. Those examples in Exhibits A, B, and C which infringe Elvis's NIL are NOT examples of Elvis Presley singing. They are synthetic and unlicensed uses of Elvis' voice and likeness, which have been reproduced, published, publicly performed, distributed, displayed and made available to the public by Suno to sell its products and services, with the knowledge that these uses of his voice and likeness were unauthorized. There are hundreds to thousands more like it.

---

[7] "The Elvis Plaintiffs" are defined below, on Page Four.
[8] "The Raleigh Plaintiffs" are defined below, on Page Four.

16. These outputs, and the numerous examples discussed below, represent "output that contain[] a voice that [i]s 'readily identifiable' as and solely 'attributable to' [Elvis Presley]" despite Suno denying that by its own practices and design that such output exists. *Isbell*, 26-cv-14005, ECF 30, at 28 (D. Mass) (Suno's Memorandum in Support of Motion to Dismiss) (quoting T.C.A. 47-25-1102(6)). As noted, they are quite literally the "prompts for specific artists or copyrighted songs" which Suno represented to the Massachusetts District Court as allegedly "never [being] allowed" and thus not existing. *Id*. at 4.

17. What's more, as referenced above, some of these egregious violations of Elvis' likeness rights are part and parcel of Suno's potpourri of willful violations of Section 106 of the United States Copyright Act in which Suno reproduced, publicly performed, and distributed AI versions of *Elvis' actual songs*. *See, e.g.*, Exh. A-2 (complete reproduction of Elvis' song 'Can't Help Falling in Love' with full lyrics and use of Elvis' voice); Exh. A-2a (complete reproduction 'remix' outputted using the same infringing Suno output from Exh. A-2).

18. Elvis' voice possessed a distinctively rich vocal timbre, with a warm velvety resonance and perfectly employed vibrato, coupled with his ability to vary his technique and delivery within the same song as well as across several different styles of music, which became his immediately recognizable musical signature across the world. As contemporary country music star Carrie Underwood put it: "Before I knew anything about him, I knew his voice."[9] Truly "[a] voice is as distinctive and personal as a face. The human voice is one of the most palpable ways identity is manifested. … [T]hese observations hold true of singing, especially singing by a singer of renown. The singer manifests herself in the song. To impersonate her voice is to pirate her identity." *Midler v. Ford Motor Co.*, 849 F.2d 460, 463 (9th Cir. 1988). That is exactly what has occurred here, without any doubt.

***

As a result of the foregoing, and as explained in detail below, Plaintiffs Elvis Presley Enterprises, LLC ("Elvis Presley Enterprises" ); ABG EPE IP LLC ("ABG"); The Luigi Creatore Trust and Claire

[9] https://www.graceland.com/quotes-about-elvis

Creatore and Stephen Chapman as trustees; The Susan T. Aberbach Revocable Trust and Susan T. Aberbach as trustee; The Decedents Exempt Trust Created Under The Anne-Rachel Aberbach Family Trust and Steven Lee as trustee; Jason Simeon Aberbach; Abilene Music LLC; and Raleigh Music Publishing LLC ("Raleigh") (collectively the "The Elvis Plaintiffs"), as well as Karen Zimmerman; Janice Macdowell; Helene Kaye; Karen Kaye Lee; Steven Baum; Melissa Ferrick; and Lori Zimmerman (together with Raleigh on non-Elvis compositions, the "Raleigh Plaintiffs"), for their Complaint against Defendant Suno allege, on personal knowledge as to matters relating to themselves, and on information and belief as to all other matters, further state as follows:

19. The Elvis Plaintiffs are independent music and entertainment companies, as well as trusts, individuals, and other rights holders, that own in whole and in part, or exclusively control, Elvis Presley's NIL rights or exclusive rights under the United States Copyright Act, including but not limited to the exclusive right to license, legendary musical compositions pursuant to their contracts with songwriters, artists, and rights holders, including some of the most timeless and iconic musical compositions in the world recorded by Elvis Presley. Elvis Presley Enterprises solely retains Elvis Presley's likeness rights.[10] The Elvis Plaintiffs bring this action to enforce Elvis' NIL rights and their exclusive copyrights against Suno, which has built its entire business model based on NIL and copyright infringement, including its unauthorized use and infringement of The Elvis Plaintiffs' rights, at a scale never seen before.

20. Apart from the NIL rights held by Elvis Presley Enterprises, The Elvis Plaintiffs' iconic collective music catalog contains some of the most groundbreaking, revolutionary, influential, and enduring musical compositions in human history, with Elvis Presley selling over an estimated one billion records worldwide,[11] and generating billions of streams worldwide. These distinguished works include: "All Shook Up"; "Can't Help Falling in Love"; "If I Can Dream"; "Don't Be Cruel"; "A Little Less Conversation"; "Return To Sender"; and "(You're The) Devil In Disguise," (the "Elvis

[10] "Elvis Presley's right of publicity survived his death and remains enforceable by his estate and those holding licenses from the estate." *State ex rel. Elvis Presley Int'l Mem'l Found*, 733 S.W.2d at 99.

[11] https://www.graceland.com/achievements.

Works").

21. In addition to the Elvis Works, the Raleigh Plaintiffs, own and/or have exclusive control over hundreds of songs from other artists, including evergreen hits such as Chubby Checker's "Let's Twist Again" (the "Raleigh Works"). The 859 combined Elvis Works and Raleigh Works Defendant Suno has infringed are identified in the attached Exhibit F (collectively, the "Works"). The Works are some of the most valuable in the world. Plaintiffs are deeply protective of these iconic songs, as they contain some of the most renowned and influential lyrics and melodies in music history.

22. Suno, a Delaware Corporation with its principal place of business in Cambridge, Massachusetts, and additional offices in New York, Los Angeles, and San Francisco, constructed and trained its models on artists' NIL rights and copyrighted materials. The fabric of Suno's synthetic DNA is composed of these protected rights: Suno has mechanically encoded itself with artists' identities, hard-work, creativity, and time, and harnessed them all for a consistent conveyor belt of cold hard cash coming in, while discarding and expelling on the outbound conveyor belt these same creatives' passions, pains, and dreams in creating the very materials and identities Suno seeks to replace without compensation, despite needing them to exist at all. The next Elvis won't pick up a guitar. Suno's ravenous race to the bottom aims to make human creativity obsolete, coldly replicating without a license in seconds what takes years to learn, struggle with, maintain, and endlessly attempt to make better and perfect, begging the question from future generations who would attempt to start what is already an arduous, uncertain, and not always lucrative creative pursuit: 'What's the point?' Artists and rights holders must be free to resist and protect their humanity and that extension of their humanity poured into their creative works. This puts us at a moral and legal crossroads, where the path is a clear and straight line to the constitutional mandate of Article I, Section 8, Clause 8 of the United States Constitution, and its mission to promote the progress of the useful arts, and the ELVIS Act, and common law, created to protect one's identity, one's likeness.

23. Suno's model violates these protections in one way through cataloging by musician's name: its models are designed, instructed, and commercially released to use musicians' NIL as a retrieval key. For instance, Suno provides the ability to search its music repository, under its 'Explore'

tab function, for songs, creators, albums, playlists, and genres.[12] Typing "Elvis" into the search bar, even as of October 31, 2026, populates several 'albums' and 'playlists',[13] as seen below:




Many of these 'albums' and 'playlists' contain infringing NIL materials and infringing copyright materials,[14] along with AI generated cover art of Elvis' image and likeness which drives traffic to

---

[12] https://suno.com/explore

[13] https://suno.com/explore?q=Elvis

[14] For example, the 7:11 long version of 'Elvis Presley – Blue Suede Sin Medley' (*supra*, at ¶11, Exh. A-1), which infringed both Elvis' NIL and the Elvis Works 'Can't Help Falling in Love'; 'All Shook Up'; and 'Don't be Cruel' (among half a dozen other songs recorded by Elvis but not controlled by the Elvis Plaintiffs), is within the eleven song "Elvis Presley" playlist six playlists over to the right.

Upon information and belief, every song within the 84 song "Elvis" playlist violates Elvis' NIL rights, including one ("Can't Help Falling in Love (Cover)" [https://suno.com/song/bc2244c8-5aa4-4529-ae48-9662ce1620e1]) which violates both his NIL rights and the Elvis Plaintiffs' copyright in that song, which is Elvis' current highest streaming song on Spotify with over 1.42 billion streams. https://open.spotify.com/track/44AyOl4qVkzS48vBsbNXaC. (Exh. A-2); (*see, also, e.g.*, Exh. B-8, 'Just You and Me' Suno Output, wherein a commenter states "I definitely thought Elvis was on this

those landing pages. Upon information and belief, typing in a musician's name went even further in previous iterations of Suno, creating a musician-based channel with a song, description, and graphic invoking the musician's identity[15] (violating Elvis' likeness in his image in addition to the rights in his voice under the ELVIS Act). This is also proof of Suno's system: with nothing but a name it generates a universe of related content, which can be traced back to Suno's behind the scenes copying and training and its internal constitution, rather than any alleged creative contribution by any user. It is evidence that Suno has ingested, cataloged, and now makes use of artists' likenesses to further its business model. Plaintiff's claims are for Suno's own conduct, not any act by a user. Entering a musician's name into Suno's 'Create' function, such as Elvis', causes Suno to generate unauthorized output based on his NIL, which copies and reproduces the signature and recognizable aspects of his distinguished voice. What's worse, upon information and belief, with a Suno Pro account users can *save* a 'voice' and re-use it to make new output, and this has occurred and resulted in further proliferation and derivation of Elvis' protected NIL without authorization (the "Voices Feature"). This feature allows a user to take sections of vocals and save them, and therefore users can then save parts that sound like an artist they are attempting to simulate and Suno will create and publish endless new commercial outputs with that voice. *See, e.g.*, Exh. C-12 'Zeon of Mine', Suno output infringing Elvis' NIL rights in his voice which states it is "Made from" an apparently saved/stored "Voice", which Voice bears the identifying title "Elvis".

24. Upon information and belief, and as detailed above, Suno allows name prompts without a filter, or with just the pretext of a filter. Entering a name prompt alone shows that 1) Plaintiffs' and others' identifying attributes are stored inside Suno's model in functional, accessible, name-indexed form; and 2) Suno's product recognizes, retrieves, and deploys the identities of

---

track. Gotta love how Suno can make that believable!" and the user responds "Thank you, my friend. SUNO is really good at this indeed.").

The eleven song "Elvis Remakes" infringes the copyrights in eleven Elvis songs, three of which are property of The Elvis Plaintiffs (the infringing song titles are verbatim copies with 'Elvis Presley' at the end: "Can't Help Falling in Love - Elvis Presley"; Return To Sender - Elvis Presley; "(You're The) Devil in Disguise - Elvis Presley"). *See* Exhs. D-1, 2, & 3.

[15] *See Isbell, et al. v. Suno, Inc., et al.*, 1:26-cv-14005, ECF 1, at 3 (D. Mass) (Complaint).

musicians by name. This is true even where the quality of Suno's outputs falls short of the true talent it evokes. Suno's system recognizes "Elvis" or "Elvis Presley" as far more than a mere text string; it is a retrieval key for a set of performer-specific representations that it can then use to generate a response associated with him. From a name prompt alone, a user receives a multi-modal experience evoking that named musician. Upon information and belief, this includes or included access to a generated song like one the named musician might create, a description of the musician's attributes, and a related image.

25. Utilizing the 'Create' function, and without prompting Suno with **any** input other than the lyrics

I am rockin this rockabilly like E L V I S P R E S L E Y
Thank ya thank ya very much I ain't shy
He has left the building
But he is still the King

as recently as October 7, 2026, Suno's model generated two outputs titled "He Is Still The King", each of which contained a copy of Elvis' unmistakable and iconic voice singing over a rockabilly-style generated track. This demonstrates the model does not even need to be prompted to make a song 'sound like an artist' or put into a certain style, here, it is pulling just from the lyrics and reaching into its index of NIL material to generate output that is infringing, directly contradicting Suno stating in its papers in *Isbell* that "Suno does not permit the use of the artist name to directly instruct the model what kind of music to create." *Isbell*, 26-cv-14005, Memorandum in Support of Motion to Dismiss, ECF 30 at 7. This also clearly demonstrates Suno's specific ingestion, copying, training, indexing, and outputting of Elvis' protected right in his voice, which outputs are then published, distributed, performed, transmitted, and made available to the public. The primary purpose of Suno's technology and tools is to produce particular identifiable individual's voices for such distribution and availability to the public, and it has done so here for Elvis using its technology, as explained throughout.

26. Further, when listening to a song on Suno, the model algorithmically indexes, categorizes, and recommends 'Similar' songs in a vertical pane on the right of the screen. Upon information and belief this is based on artists' NIL, including Elvis'. For example, playing the NIL

infringing song titled "Elvis in Palm Springs" prompted Suno to display similar songs for a user to select from, and if none is selected, to then autoplay the next song in the 'Similar' pane, in this case "Why'd You Say Goodbye", which also infringes Elvis' NIL.[16]

27. Suno also allows users to navigate the 'Home' tab on the left of its site. The Home tab has an embedded version of the 'Create' tab for users to describe a song they want to make, 'Staff Picks' which presumably recommends songs from Suno's staff, recommendations based on the music a user creates, as well as a Suno-recommended 'For You' list with a thumbprint icon. Here, Suno recommended in its initial three song 'For You' recommendation list the song "Hold Me Tight (WIP) (Take A)" which infringes Elvis' NIL, as well as "Heaven Is In Your Kiss", another Elvis NIL infringing song.[17]

28. Suno has admitted to copying "essentially all music files of reasonable quality that are accessible on the open Internet" to train its AI music generator—a dataset of tens of millions of songs/recordings that, given its scope, necessarily includes Elvis' NIL, The Elvis Plaintiffs' Works, and all of the Works. Indeed, publicly available sources, such as *The Atlantic's* AI Watchdog (first published September 2025, expanded to music search tools in June 2026), confirm that the Works appear in data sets known to be used by AI companies in the training of AI models. Publicly available sources also confirm that Suno accessed these Works from licensed streaming services (such as Spotify, YouTube, or SoundCloud) and paywalled platforms (*e.g.* Tidal), as well as others, including Jamendo (www.jamendo.com), Free Music Archive (freemusicarchive.org), and MusicBrainz (musicbrainz.org), by scraping and circumventing technological access controls—in part through the use of tools and services supplied by web scraping company Bright Data (as further defined below more specifically). The Elvis and Raleigh Plaintiffs never authorized Suno to copy, reproduce, or otherwise use Elvis' NIL or the Works for AI training or any other purpose.

29. Suno did so in a manner that completely disregards the rights of The Elvis and Raleigh Plaintiffs, violates the ELVIS ACT and common law, constitutes copyright infringement, and constitutes other unlawful conduct, by making unlicensed copies of the Works, as well as server

---

[16] *See* Exh. C-10.
[17] *See* Exh. C-11.

copies, removing Copyright Management Information ("CMI"), and training the AI models themselves to ***disregard*** the CMI in both its training and output. Suno has not only run roughshod over name, image and likeness rights, but has violated virtually every exclusive right of the copyright owners of the Works under Section 106 of the Copyright Act.

30. Suno took the Works and the sound recordings embodying them and trained its AI model so that its users, which number over one hundred million, can create sound recordings based upon prompts. Suno operates on a "freemium" model allowing some free access, but charges users monthly subscription fees to fully use its platform, which produces AI-generated music files intended to mimic human-made songs and human voices, including Elvis' immediately recognizable voice. Upon information and belief, Suno's paid subscribers unlock audio-input and steering tools that allow users to incorporate audio as inspiration or source material in the generation process, while Suno also purports to grant paid users the right to download and commercially exploit the resulting tracks in commerce outside the platform.

31. Suno's users do not even have to write lyrics nor melodies. No, armed with the unauthorized NIL of the world's artists and illicit copies of millions of copyrighted works—including The Works— Suno's AI model can create an entire song, including the instrumentals, (infringing) vocals, and entirely generated lyrics, all thanks to the training on the NIL and these unlicensed copies of the Works in its library. That is, Suno made illicit copies of the voices of artists from all over the world throughout music history, and of millions of copyrighted musical works, including The Works, and then—without any remuneration to the rights holders—created a platform where anyone capable of paying $10 per month can create complete songs based entirely on these illicit copies.

32. This is not speculation. Suno's Founder and CEO, Mikey Shulman gave an interview admitting: "One of the biggest challenges in modeling music is just that a three minute song has so many data points in it that it is really difficult for models to accurately capture all of the interesting stuff there. Our models are taught to just continue a piece of music. And with that, and a little bit of extra sauce for getting these things to start properly, we can go from an idea in somebody's head, to

an entire three minute song very easily."[18] That is, while Suno advertises itself as a completely generative AI music creation service that generates songs from whole cloth, even stating in its filing in *Isbell* that "Suno's purpose is to create *new* music" *Isbell*, 26-cv-14005, Memorandum in Support of Motion to Dismiss, ECF 30 at 3 (emphasis Suno's), its own CEO admits that it has just trained its models to "continue a piece of music"—that is, the music that Suno illegally scraped and copied to train its Model in disregard of the rights of the copyright and NIL holders allows Suno to create unlicensed derivative works thereof and/or pirate artists' identities.[19] Without the unlawful copying of The Works, and ingestion into its AI models, as well as the infringement of Elvis' NIL, Suno's service would be incapable of producing the product/service that has been used by more than 100 million people and netted it over 2 million paid subscribers.[20]

33. Suno has materially enjoyed the fruits of others' labor closing its Series D in June 2026, raising over $400 million at a $5.4 billion valuation.[21] Indeed, Suno's business is generating hundreds of millions of dollars annually with projected revenue to reach $1 billion by 2028.[22]

34. Mr. Shulman's motivations are clear. Because, per Mr. Shulman, "[i]t's not really enjoyable to make music now," [23] he decided to cut out human creation from the process. Mr. Shulman explained "[w]e didn't just want to build a company that makes the current crop of creators

---

[18] "Suno Generates Beautiful Songs with Oracle Cloud". www.youtube.com/watch?v=aKlIQiS8MLc

[19] Suno also curiously states that it "does not advertise using any artist's name. It never suggests that any artist endorses Suno, or is affiliated with Suno in any way[,]" *Isbell*, 26-cv-14005, (Suno's Memorandum in Support of Motion to Dismiss), ECF 30, at 7, however it was recently embroiled in a media firestorm over an unauthorized advertisement it circulated of R&B icon Mary J. Blige appearing to endorse Suno and an AI-generated song that sounded remarkably like her work, despite her not approving the ad and appearing to be taken out of context. https://variety.com/2026/digital/news/suno-kills-mary-j-blige-ad-endorse-ai-platform-1236850584/

[20]https://www.forbes.com/sites/conormurray/2026/02/26/ai-music-platform-suno-reaches-2-million-subscribers-as-industry-backlash-grows/

[21] Stassen, Murray, "Suno Raises Over $400 Million, Pushing Valuation to $5.4 Billion." Music Business Worldwide, <www.musicbusinessworldwide.com/ suno-raises-over-400-million-pushing-valuation-to-5-4-billion/> (last visited July 30, 2026).

[22] Kristin Robinson, Is Suno the Music Industry's Biggest Nightmare – Or Greatest Hope?, Billboard (Mar. 11, 2026) (available at https://www.billboard.com/pro/suno-ai-music-startup-cover-story/ (last visited Oct. 18, 2026)).

[23] 20VC Podcast with Harry Stebbings, *Mikey Shulman, CEO @Suno: The Future of Music, What is Gonna Happen?* at 23:01-23:16 (Jan. 10, 2025).

10 percent faster or makes it 10 percent easier to make music. If you want to impact the way a billion people experience music you have to build something for a billion people."[24] Said another way, Suno was never meant to be a tool for artists to create music but was instead always meant to replace the artists whose works and identities were being unlawfully copied by directly reaching those artists' listeners with AI-generated substitutes which copy the originals.

35. Suno's investors knew from the beginning that they were funding a massive vehicle for copyright infringement with one investor calling the risk that labels and publishers would sue as just "the risk we had to underwrite when we invested in the company, because we're the fat wallet that will get sued right behind these guys… Honestly, if we had deals with the labels when this company got started, I probably wouldn't have invested in it. I think that they needed to make this product without the constraints."[25]

36. And, when the labels and publishers did, in fact, file suit, Suno agreed to settle with Warner Music Group to use its sound recordings as training data for generative AI models. Suno agreed to "deprecate[]"[26] its then-current models and launch the now-operable V6. Mr. Shulman commented on the settlement: "I don't think of what we did as a settlement. I think about this much more like a partnership . . . . It is much more long term."[27] Suno also reached an agreement with BMG. In a public statement Mr. Shulman made an about-face, no longer seeing partnerships with rightsholders as "constraints" but as a partnership that would "generate new revenue" for artists and songwriters, claiming to believe in "responsibly [] working directly with the people who make music

---

[24] *Id.*

[25] Brian Hiatt, *A ChatGPT for Music is Here. Inside Suno, the Startup Changing Everything,* Rolling Stone (Mar. 17, 2024) (available at https://www.rollingstone.com/music/music-features/suno-ai-chatgpt-for-music-1234982307/ (last visited Oct. 18, 2026)).

[26] Press Release, Warner Music Group, *Warner Music Group and Suno Forge Groundbreaking Partnership* (Nov. 25, 2025) (available at https://www.wmg.com/news/warner-music-group-and-suno-forge-groundbreaking-partnership (last visited Oct. 18, 2026)).

[27] Kristin Robinson, *Is Suno the Music Industry's Biggest Nightmare – Or Greatest Hope?,* Billboard (Mar. 11, 2026) (available at https://www.billboard.com/pro/suno-ai-music-startup-cover-story/ (last visited Oct. 18, 2026)).

and the companies that represent them."[28] Likewise, Suno has reached an agreement for a "strategic partnership" with Believe, a leading digital music company, for it to provide its music as training data for Suno's models.[29] That is, now that it faces numerous lawsuits and challenges from rightsholders, Suno has all but admitted that there is a functioning market for licensing music and sound recordings for training data, that such licenses are part of "responsibly" creating AI models, and essentially admitting to the unlawfulness of its conduct for all the music used to train its models that remains unlicensed—including The Works. Suno's business model was admittedly and clearly: infringe now, make billions by being the first mover, and try to settle on the cheap later. Seeking forgiveness is clearly more profitable than permission, which they obviously could have done but consciously chose not to do. Indeed, its less profitable AI music generating competitor, Udio, has reached several licensing deals with major labels and large independent publishers, and is expected to launch a reimagined service where artists can opt in (*or not*) to having their voices used, and will get "credited and paid."[30]

37. The reason for Suno's about face and sudden willingness to license is no surprise. Suno has lost every step of the way. Its motions to dismiss in other cases have been denied, and, on July 31, 2026, the Munich Regional Court in Germany ruled in a suit brought against Suno by Germany's music collecting society, GEMA, for identical conduct to that at issue in this case, that Suno infringed GEMA's copyrights by training its models on GEMA's songs in the U.S (of which it stored entire works inside its models), and by reproducing them. Judge Elke Schwager noted that it was undisputed that Suno obtained the training data through stream-ripping, and Suno admitted it trained on GEMA's works without paying for them. Most importantly, the court ruled that Suno

---

[28] Press Release, BMG, *BMG and Suno Announce Global Strategic Alliance Advancing AI Music Opportunities And Revenue Streams* (Aug. 12, 2026) (available at https://www.bmg.com/news/bmg-and-suno-announce-global-strategic-alliance-advancing-ai-music-opportunities-and-revenue-streams (last visited Oct. 18, 2026)).

[29] Press Release, *Believe and Suno Announce Strategic Partnership to Advance Licensed AI Music Opportunities for Independent Artists and Labels,* Believe (Sept. 8, 2026) (available at https://www.believe.com/press-release/believe-and-suno-announce-strategic-partnership/ (last visited Oct. 18, 2026)).

[30] https://www.musicbusinessworldwide.com/after-universal-warner-and-merlin-deals-now-udio-inks-licensing-agreement-with-kobalt/

needed a license to GEMA's works under U.S. copyright law, where the training physically happened. And finally, it granted GEMA an injunction and issued a disclosure order requiring Suno to disclose its revenue tied to the infringed works.[31]

38. All irony lost, Mr. Shulman remarked about another pending lawsuit against Suno, "[i]t just seems silly to throw a bunch of venture dollars at lawyers instead of sitting down and talking about how you could work together."[32] However, at no point prior to launching any of its AI models did Suno "sit down" with any of The Elvis or Raleigh Plaintiffs, and this statement is belied by the investor statements, discussed *ante*, that prior to getting caught with their proverbial hands in the cookie jar, Suno felt that it didn't need the "constraints" of license agreements with the rightsholders. That is, Suno willfully infringed on almost every artists' NIL in existence, and on millions of copyrights—including all of the Works in this case, and Elvis' NIL.

39. Bright Data Ltd., with its wholly-owned subsidiary, Bright Data, Inc. (collectively, "Bright Data") provides data-scraping, proxy-network, and dataset services sold to customers including AI developers, including, as relevant here for Suno. Bright Data develops, markets, and sells web-scraping infrastructure, residential and datacenter proxy networks, and pre-packaged datasets to business customers worldwide. Publicly available sources show that according to leaked source code from Suno, it used proxy services it acquired from Bright Data, scraped "millions of songs and lyrics" from YouTube Music, Deezer, and Genius.[33] In this leaked source code, there is a YouTube Music workflow that shows 2,057,486 artist records saved as output. For each artist, the

---

[31] Virginie Berger, *Suno Loses Copyright Lawsuit To GEMA—AI Music Companies Should Worry*, Forbes (Aug. 5, 2026), https://www.forbes.com/sites/virginieberger/2026/08/05/suno-lost-to-gema-why-the-ruling-should-worry-ai-music-companies/ (also noting the suit filed by Koda, Denmark's music collecting society, against Suno over the same conduct). Further, the Society of Composers, Authors, and Music Publishers of Canada (SOCAN) filed suit in the Federal Court of Canada against Suno on September 2, 2026, for the same conduct. https://www.socan.com/socan-is-standing-up-for-music-creators-and-publishers-with-legal-action-against-suno-inc-for-unauthorized-use-of-music-in-generative-ai-platform/.

[32] Stuart Dredge, *Suno Boss Targets 'Bigger, Brighter Future' With Music Industry,* Music Ally (Jan. 14, 2025) (available at https://musically.com/2025/01/14/suno-boss-targets-bigger-brighter-future-with-music-industry/ (last visited Oct. 18, 2026)).

[33] Koebler, Jason, "Hack Reveals Suno AI Music Generator Scraped YouTube, Deezer, and Genius," 404 Media, <www.404media.co/hack-reveals-suno-ai-music-generator-scraped-youtube-deezer-and-genius/> (last visited July 30, 2026)

code requests the artist's song playlist without a track limit. If there is no playlist identifier, it falls back to the song results already available. This shows a systematic effort to collect across artists' catalogs. Further, a separate Genius workflow records 6,980,653 successful song-page processing records confirming that not less than this number of extracted lyrics exist in Suno's code.

For example, publicly available sources have confirmed that Suno used Bright Data's services to scrape and incorporate into its training data files like "youtube_music" which includes over two million music clips of approximately 113,879 hours—the equivalent of thirteen ***years***—of music files scraped from YouTube.[34]

## I. THE PARTIES

40. Plaintiff Elvis Presley Enterprises, LLC is a Delaware limited liability company with its principal place of business located at 1411 Broadway, 21st Floor, New York, New York.

41. Plaintiff ABG EPE IP LLC is a Tennessee limited liability company with its principal place of business located at 1411 Broadway, 21st Floor, New York, New York.

42. Plaintiff Raleigh Music Publishing LLC is a New York limited liability company with its principal place of business located at 1411 Broadway, 21st Floor, New York, New York.

43. Plaintiffs The Luigi Creatore Trust and Claire Creatore and Stephen Chapman in their capacity as trustees are located in Boca Raton, Florida.

44. Plaintiffs The Susan T. Aberbach Revocable Trust and Susan T. Aberbach in her capacity as trustee are located in Aventura, Florida.

45. Plaintiffs The Decedents Exempt Trust Created Under The Anne-Rachel Aberbach Family Trust and Steven Lee in his capacity as trustee are located in Arizona.

46. Plaintiff Jason Simeon Aberbach is a natural person domiciled in California.

47. Plaintiff Abilene Music LLC is a New Jersey limited liability company.

48. Plaintiff Karen Zimmerman is a natural person domiciled in New Jersey.

49. Plaintiff Janice MacDowell is a natural person domiciled in New Jersey.

50. Plaintiff Helene Kaye is a natural person domiciled in New York.

---

[34] *See* note 14, *supra*.

51. Plaintiff Karen Kaye Lee is a natural person domiciled in New York.

52. Plaintiff Steven Baum is a natural person domiciled in New York.

53. Plaintiff Melissa Ferrick is a natural person domiciled in New York.

54. Plaintiff Lori Zimmerman is a natural person domiciled in New Jersey.

55. The Elvis and Raleigh Plaintiffs collectively own and/or control with the exclusive right to license, among many other exclusive rights under the Copyright Act, the Works in Exhibit F, as well as the right to initiate litigation on their behalf or own/control Elvis' likeness rights. Each Work listed in Exhibit F constitutes an original work or copyrightable subject matter under the Copyright Act, 17 U.S.C. section 101, et seq., and has been registered with the U.S. Copyright Office as evidenced by the registration numbers listed therein. The copyrights for each of the Works in Exhibit F remain valid and subsisting and have been owned and/or controlled by The Elvis and Raleigh Plaintiffs at all times relevant to the allegations in this Complaint.

56. Defendant Suno is a Delaware corporation with its principal place of business at 17 Dunster Street, Cambridge, Massachusetts 02138. Suno develops, operates, and sells a generative AI music service that creates digital music based on user prompts. Suno charges users monthly subscription fees to use its platform, which produces AI-generated music files designed to mimic human-made songs.

## II. Jurisdiction and Venue

57. This Court has subject matter jurisdiction pursuant to 28 U.S.C. sections 1331 (federal question) and 1338(a) (copyright actions) because the claims alleged herein arise under the Copyright Act of 1976, 17 U.S.C. sections 101 *et seq.*, including the Digital Millennium Copyright Act, 17 U.S.C. sections 1201-1205.

58. This Court has personal jurisdiction over Defendant Suno because Suno has transacted business in this District, including offering and selling its AI music generation service to customers in California via the Internet; because Suno's infringing conduct has been directed at and caused harm in this District; because the infringing conduct occurred in this District given Suno's use of Oracle Servers physically located in this District; because, on information and belief, it operates its business out of its offices located in this District; and because the exercise of personal jurisdiction over Suno

comports with due process. Suno operates its business out of offices in Cambridge, Mass., New York, Los Angeles, and, more recently San Francisco. It has been reported that Suno opened its San Francisco office in late March 2026 in SoMa ("South of Market" area). S. Chen, *AI music generator Suno opens SF office* (April 3, 2026). According to that report, Suno's co-founder/CTO Georg Kucsko told Axios (via email) that opening doors in San Francisco "will be critical as we continue to scale" and that the company is "investing especially heavily in our machine learning team to develop our frontier music model").[35] Since that time, Suno has been actively recruiting employees to work in its San Franciso office. *See* E. Tanaka, "AI Song Factory Suno Sneaks Into SoMa as San Francisco Tech Beat Kicks Back In," *Hoodline* (April 3, 2026) (noting at that time, "Local job listings point to an active recruitment drive for engineers, product designers and machine learning researchers based in San Francisco").[36] According to that report, many of the roles offered on Indeed "list San Francisco as the required location and note that some positions will be on site." *Id.* As of August 2026, job openings on Indeed include Lead Machine Learning Data Operations, Senior Director of Customer Experience, Senior Corporate Recruiter, Senior Counsel, Director of Accounting, and others.[37] In addition, Suno uses Oracle servers "to train its proprietary machine learning models and support growing demand for its next generation of generative music models." Oracle, *AI Innovators Flock to Oracle to Address Some of the World's Most Pressing Challenges* (March 18, 2024). According to publicly available sources, Oracle's servers are located in Virginia, Illinois, Phoenix, San Jose, CA (Northern District), as well as Mexico and Canada. According to other public sources, each of Suno's five fundraising rounds were pitched to and lead by venture capital firms located in the Northern District—Seed round (Matrix Ventures, Cambridge/San Francisco) Series A round (Matrix Ventures, Cambridge/San Francisco), B round (Lightspeed Ventures, Menlo Park), C round (Menlo Ventures, Menlo Park), and D round (Bond Capital, San Francisco).

59. Venue is proper in this District under 28 U.S.C. sections 1391(b) and/or 1400 because

---

[35] https://www.axios.com/local/san-francisco/2026/04/03/suno-ai-music-generator-startup-office-expansion

[36] https://hoodline.com/2026/04/ai-song-factory-suno-sneaks-into-soma-as-san-francisco-tech-beat-kicks-back-in/

[37] https://www.indeed.com/q-suno-l-san-francisco%2C-ca-jobs.html?vjk=34349af3bb314a9a

Defendant Suno maintains an office in this District to, among other things, manage the training of its AI Models and the data servers on which they operate, and uses data servers located in the District through Oracle Cloud Infrastructure for that purpose – which includes hosting the illicit copies of the Works on these servers.

## III. Divisional Assignment

60. Pursuant to the Court's Assignment Plan (General Order No. 44), this action is an intellectual property action within the meaning of Local Rule 3-2(c) and therefore is not subject to intradistrict venue provisions.

## IV. Further Factual Background

61. Elvis Presley resided and was domiciled in Memphis, Tennessee, beginning at age 13. His Memphis home, Graceland, was his domiciliary from 1957 until his passing in Tennessee in 1977, though he was away from 1958 to 1960, as he was very publicly drafted into and served in full-time active-duty military service as a soldier for the United States Army in West Germany. He was promoted to sergeant in 1960, and later received an honorable discharge from active duty.

62. Elvis passed away at Graceland, and is buried there with his parents, grandmother, grandson, and daughter Lisa Marie.

63. After his passing, Graceland was opened to the public as a museum and shrine to Elvis in 1982. It is now an international tourist attraction, receiving approximately 600,000 visitors each year, making it the second most famous home in the United States after the White House, and generating an estimated economic impact of $200 million per year or more for the city of Memphis.[38] Elvis' likeness is used throughout the Graceland operation.

64. In 2016 "The Guest House at Graceland," a 450-room hotel, opened steps away from Elvis' Graceland home. Graceland currently employs upward of 500 people and generates $75.4 million per year on average.

65. Elvis Presley Enterprises has licensing relationships for Elvis' likeness with businesses throughout the state, including Memphis based Mid-South Products for approximately the

---

[38] https://memphismusichalloffame.com/inductee/jacksoden/

past 15 years, a wholesaler which has $900,000 in annual sales of merchandise bearing Elvis' likeness, such as license plates, towels, salt and pepper shakers, and more, and which distributes to mom-and-pop shops throughout the state of Tennessee which depend on that income.

66. Elvis Presley Enterprises also has a licensing relationship with Memphis based Dinstuhl's Fine Candy Company, and has for approximately 60 years, wherein Dinstuhl's uses Elvis' NIL for candy wrappers and custom 'album covers' for CD and record shaped chocolates, with $49,000 in annual sales related to Elvis' likeness. It also has a licensing relationship with Lansky Brothers, a clothier in Memphis which famously "put Elvis in his first suit, and … put him in his last[,]"[39] to use Elvis' likeness for clothes and promotion featuring his likeness, generating $650,000 in annual sales.

67. Elvis Presley Enterprises also has a licensing relationship with the Country Music Hall of Fame in Nashville wherein it lends some of Elvis' articles and his likeness, including his voice, to the Hall for various exhibits, in return for the Hall lending articles from its other artists for use at Graceland.

68. Finally, as noted *supra* at ¶2, the Chief Advocacy & Public Policy Officer for the National Academy of Recording Arts & Sciences (presenters of the Grammy Awards), as well as the Senior Executive Director of their Memphis Chapter, reached out to Elvis' camp to inform them they were working on a bill with Tennessee Governor Bill Lee, that they wanted to name the bill the 'ELVIS' Act, and were seeking the blessing of Elvis' rightsholders, and stating they would hold an initial press event on it during Elvis' birthday week in 2024.

69. As Elvis was domiciled in the state of Tennessee upon his death, and Tennessee has a post-mortem right of publicity through its statutes and common law, in addition to having the strongest interest in, and most potential impairment by, the outcome of this case by virtue of Elvis' domicile at death and connection to the state, therefore, Tennessee's ELVIS Act and common law is the correct law to govern the protection of Elvis' likeness rights.

70. Since Presley's death, Presley's estate, Elvis Presley Enterprises and its predecessors

[39] https://en.wikipedia.org/wiki/Lansky_Brothers

in interest, have continuously and actively exploited Presley's identity, including his voice, for commercial purposes.

**A. The Elvis and Raleigh Plaintiffs and Their Copyrights**

71. The Elvis Plaintiffs (other than Elvis Presley Enterprises, who solely owns Elvis' likeness rights) own or exclusively control copyrights in the Elvis Works recorded and made famous by Elvis Presley. The Raleigh Plaintiffs also own and/or exclusively control the rights in the other Works listed on Exhibit F.

72. The Elvis and Raleigh Plaintiffs know that great music starts with great songwriting and masterful lyricists, and are committed to supporting and protecting the creative works the songwriters and rightsholders have entrusted to them. Plaintiffs regularly enter into licenses and other agreements for the Works, through which The Elvis and Raleigh Plaintiffs compensate rightsholders for their share of earnings. The Elvis and Raleigh Plaintiffs rely on the income received from these transactions. This system of licensing, permissions, and authorized use is the backbone of the music publishing industry and ensures that songwriters, their heirs, and publishers who have invested their blood, sweat, tears, heartache, elation, and experience into their creative works receive compensation for the use of those works.

73. U.S. copyright law simply does not let technology platforms like Suno ride roughshod over these Constitutionally mandated protections of creative expression. Indeed, copyright owners necessarily have the right to police the use of their copyrighted works. "The owner of the copyright, if he pleases, may refrain from vending or licensing and content himself with simply exercising the right to exclude others from using his property." *Fox Film Corp. v. Doyal*, 286 U.S. 123, 127 (1932); *see also Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 454 F. Supp. 2d 966, 997 (C.D. Cal. 2006) ("The right to exclude is inherent in the grant of a copyright; a copyright is not improperly expanded simply because the owner has exercised his or her power to exclude."). These are age-old, hornbook copyright principles. Defendant simply ignored them. In this age of corporations with a GDP greater than most countries in the world, this conduct is simply calculated as a cost of doing business.

74. The Elvis and Raleigh Plaintiffs rely on U.S. copyright law to protect their Works

from infringement. Without such protections, the music publishing industry would not function because songwriters, artists, and their heirs would not receive the full benefit from exploitation of musical works. Indeed, many of the heirs of the original writers rely on the revenue generated by the Works.

75. The Elvis and Raleigh Plaintiffs generate revenue from their collective catalog by licensing the Works for use in recordings, live performances, synchronization placements, mechanical reproductions, print, digital transmissions, and streaming. The value of these licensing activities depends entirely on The Elvis and Raleigh Plaintiffs' ability to enforce their exclusive right to authorize—or decline to authorize—the reproduction, distribution, and public performance of its copyrighted Works. Defendant's conduct directly undermines and dilutes that exclusivity.

76. One way The Elvis and Raleigh Plaintiffs exploit the Works is to grant licenses for the display of the copyrighted lyrics of their Works to aggregator websites, including but not limited to LyricFind and Musixmatch. These licenses require that the licensee provide the corresponding song title, songwriter(s), and other identifying information for the Works—*i.e.* the CMI. The display of the CMI is essential for informing consumers about the authors of musical works, ensuring credit is given to creators, maintaining copyright protections, ***and*** to direct other putative licensees to The Elvis Plaintiffs. Any removal or alteration of CMI by unlicensed parties violates these rights and harms the interests of The Elvis Plaintiffs and its songwriters, their heirs, and other rights holders. It also violates the law.

**B. Suno's Infringing Conduct**

**(i) Suno unlawfully scraped data from the internet, including The Works.**

77. Suno operates a subscription-based generative AI platform that generates new songs and audio recordings in response to user text prompts. Suno became widely available starting with version 3 on March 24, 2024, version 5.5 launched in March 2026, and version 6 launched on September 9, 2026.

78. Suno's AI model was trained on a corpus of recorded music that, by Suno's own admission in separate litigation, encompasses substantially all available commercial recordings of adequate fidelity. In its answer to the complaint in *UMG Recordings, Inc. v. Suno, Inc.*, No. 1:24-cv-

11611-FDS (D. Mass.), Suno stated that its wholesale direct copying, which it terms 'training data' includes essentially all music files of reasonable quality that are accessible on the open Internet, abiding by paywalls, password protections, and the like."

79. The Works are among the most widely distributed musical works on licensed streaming services. Given Suno's self-described training methodology—which involved harvesting effectively all available recordings—it is a near certainty that The Elvis and Raleigh Plaintiffs' Works were copied into Suno's training sets. The Works are available on Spotify, Apple Music, YouTube, Amazon Music, SoundCloud, and Tidal, among others, all of which are duly licensed with The Elvis and Raleigh Plaintiffs and require some form of account registration, subscription, or other access credentials to use.

80. Upon information and belief, Suno obtained copies of the Works by accessing these platforms through automated scraping tools that bypassed login requirements, subscription gates, and technical anti-bot defenses—in part through tools and proxy services supplied by Bright Data. Suno then ingested these unauthorized copies into its training pipeline, producing an AI model capable of generating audio that closely imitates the style, structure, and expressive character of the copyrighted recordings on which it was trained.

81. Specifically, with respect to its scraping of YouTube music, Suno illicitly used a notorious method of music piracy known as "stream ripping" to download millions of songs. While YouTube allows users to stream content (playing it as received), it is not designed to allow and instead prohibits making permanent, unrestricted copies of the content it streams. In this regard, YouTube's Terms of Service generally prohibit the unauthorized use of recordings available on its platform.

82. Moreover, YouTube employs enhanced technological measures to protect against unauthorized downloading and copying of licensed content, including The Works. Specifically, YouTube employs a "rolling cipher" encryption measure to control access to such content, preventing external sites or services from directly downloading protected media files. YouTube maintains two different URLs for any given video: the page URL, visible to the user, is for the webpage where the video playback occurs, and the file URL, not visible to the user, is for the video file itself that is played within the page. The file URL is encrypted using a complex and periodically changing

algorithm (the "rolling cipher") that is designed to impede external access to the underlying YouTube video files, thereby preventing or inhibiting any downloading, copying, or distribution of the videos. Upon information and belief, the video player on the page URL must decrypt or descramble the file URL to locate and play the underlying audiovisual file.

83. Although YouTube revises the rolling cipher by design, there are illicit tools and services that circumvent the encryption, download audiovisual content available on YouTube, and create copies that can be downloaded and further distributed by users without restriction. This process is commonly known as scraping or "stream ripping."

84. Upon information and belief, Suno used such stream ripping tools—specifically, tools known as YT-DL, and YT-DLP, to circumvent YouTube's encryption and scrape copyrighted recordings from YouTube. This stream-ripping is the key means by which Suno engages in its first infringing act of reproducing the Works.

85. Suno's scraping was made public on or about September 2, 2025, after the ICMP shared evidence with Billboard, in particular private datasets that demonstrate the illegal scraping of copyrighted sound recordings from YouTube by Suno. Suno's scraping of the Internet and ingestion of this content violates the Copyright Act and constitutes infringement of the Works, and other illegal activity discussed below.

**(ii) Suno utilized Bright Data's technology products to assist in its scraping of copyrighted materials from the internet and to remove CMI from these materials.**

86. Bright Data is a commercial vendor of web-scraping infrastructure whose business model is built on enabling customers to extract data from websites at scale—including websites that employ technical measures to prevent exactly that kind of bulk automated extraction. Bright Data's product suite includes residential and datacenter proxy networks that rotate IP addresses to evade rate limits and IP bans; a "Web Unlocker" service designed to defeat CAPTCHAs, JavaScript challenges, and bot-detection systems; and a "Scraping Browser" that renders pages in a browser environment without the headers and footers to circumvent client-side protections.

87. As discussed above, CMI regularly exists in the headers and footers of files containing

musical works. Making the deliberate choice to exclude headers and footers is identical to making the deliberate choice to remove CMI from these files. Suno thus extracted musical recordings from various above-alleged sources on the Internet and extracted the CMI from the entirety of these files, which includes the CMI attributable to the Works.

88. Upon information and belief, Bright Data's tools and services were used by Suno to extract the Works from licensed streaming and lyrics platforms. This extraction required circumventing the technological protection measures those platforms employ: authentication gates, subscription paywalls, rate limiting, CAPTCHA challenges, and robots.txt access restrictions, as well as removal of CMI.

**(iii) Suno's Outputs also constitute copyright infringement of The Works.**

89. As discussed above, Suno's Founder and CEO, Mikey Shulman admitted that the model faces "challenges in modeling music" and "our models are taught to just continue a piece of music."[40]

90. Many outside observers drew the obvious conclusion that Suno's model, however, was clearly trained on, made copies of, and used copyrighted music. A few examples are:

- "Though neither company will directly confirm or deny it, there is substantial reason to believe that . . . Suno . . . w[as] trained on copyrighted music, without permission[.]" Brian Hiatt, *AI-Music Arms Race: Meet Udio, the Other ChatGPT for Music,* Rolling Stone (Apr. 10, 2024).
- "While details about the data that trained these AI tools are spare, there is plenty of reason to believe that they are trained on copyrighted music." Sharon Goldman, *AI Music May be Having a Moment, But Human Songwriters Would Like a Word*, Fortune (May 17, 2024)
- "Although Suno hasn't revealed what music has been used to train its music-generation models, it seems almost certain that the startup has used materials without the explicit consent of their creators. For one thing, many of its musical outputs are

[40] "Suno Generates Beautiful Songs with Oracle Cloud". www.youtube.com/watch?v=aKlIQiS8MLc

somewhat similar to popular songs." Mike Wheatley, *Generative AI Music Maker Startup Suno Raises $125M in Funding,* SiliconAngle (May 21, 2024).

- "To create music as convincing as some of the examples generated by Suno and other platforms using AI algorithms means training those algorithms on existing music, and lots of it. And that's where copyright comes into play, because it's become plainly obvious that many AI models have been built by ingesting enormous quantities of copyrighted material." Daniel Tencer, *Suno Could Get Sued By The Record Business. Who's Backing it With $125M?,* Music Business Worldwide (May 28, 2024).

91. Suno never sought or obtained a license from The Elvis or Raleigh Plaintiffs to reproduce, copy, train, publicly perform or display any particular composition or sound recording in The Elvis or Raleigh Plaintiffs' catalog, much less for all of the Works. Suno's copying and training-data practices constitute direct copyright infringement on a massive scale.

92. While Suno claims to have put in guard rails to prevent output that is immediately recognizable as like that of existing artists, these guardrails are easily circumvented. For example, while, currently, the platform will not permit a user to include "Reba McEntire" in the prompt, it will allow users to include the prompt "in the style of Reba McIntyre [sic]" in creating a female-vocal country song in McEntire's style. Indeed, third party applications like "HookGenius" are advertising services to get around these guardrails by providing users artist-specific prompts for Suno to generate entire albums based on the users' favorite artists.[41] And further, Suno has entered into paid affiliate relationships with a number of Suno content creators, providing them with a commissioned referral link in exchange for producing tutorial content that drives paid subscriptions. One creator's affiliate-linked tutorial expressly describes Suno's practice of flagging and rejecting prompts that reference "a specific band name or artist," and is devoted entirely to teaching viewers, in his own words, how to "get around" that restriction "and still have it produce a track that sounds similar to that artist." The same creator sells a paid catalog of prompts marketed as "Suno-ready" for generating music

[41] *See* https://hookgenius.app/learn/suno-eminem-style/ and https://hookgenius.app/pricing/

resembling a specific, named musical act.[42] Upon information and belief, Suno is paying people to teach others how to get around its own guardrails in order to drive traffic and purchases of paid subscriptions.

93. Further, despite previous protestations that Suno did not merely regurgitate pre-existing content and rejecting prompts that use artists' names, Suno V6 (the most recent version) now accepts these requests and "redirect[s]" them "toward descriptive musical characteristics" that Suno attributes to that artist,[43] unless it fails to do so still and directs users to the artist as seen above in ¶23. That is, Mr. Shulman, Suno's CEO, is admitting that Suno was always designed to model after pre-existing works, but it was not until Suno concluded that its users wanted to use artist-specific prompts that it made the business decision to facilitate the creation of facsimiles of copyrighted works—including the Works. Suno was just withholding this capability until it found a way to market it.

94. Further, V6 is trained from user-uploads without appropriate safeguards to prevent users from uploading copyrighted lyrics and music. For example, user uploads have been allowed since 2024[44] but with a statement that copyrighted uploads would be blocked.[45] However, Suno announced new safeguards for audio and lyrics for V6 (though Suno continues to commit infringement through this model, *see, e.g.*, Exh. B-4).[46] The announcement of new safeguards is at least a tacit admission that the previous safeguards were not effective enough to prevent copyright infringement regarding output. The Suno terms and conditions grant Suno a "perpetual, irrevocable"

---

[42] Jamie Aplin, *How to sound like a specific Artist in Suno (without using their name)*, YouTube, at 0:15 (uploaded February 15, 2026), https://www.youtube.com/watch?v=3DiaXhCcYZE (despite being a tutorial on how to get around Suno's guardrails, the content creator states "I've actually had Suno reach out to me...they offered me an affiliate link and I'm now using that. So, if you're watching this video and you haven't yet signed up for one of the paid versions of Suno, go ahead and do that. It's going to support this channel so I can keep creating these tutorials to hopefully help you make better song creations with that platform."); *see also id.* at 1:44, 15:38.

[43] Mikey Shulman, *How We're Building the Future of Music Responsibly,* Suno (Aug. 6, 2026) (available at https://suno.com/blog/building-the-future-of-music-responsibly (last visited Oct. 18, 2026)).

[44] https://suno.com/release-notes/audio-inputs-for-everyone (last visited Oct. 18, 2026).

[45] https://blog.suno.com/blog/audio-inputs (last visited Oct. 19, 2026).

[46] https://suno.com/blog/introducing-v6 (last visited Oct. 19, 2026).

license to train on all user-uploaded content.[47] As such, Suno is clearly training its models on user submissions, including copyrighted works and the Works.

95. There is further evidence that Suno's guardrails cannot prevent copyright infringement. Suno's platform generates songs and lyrics based on user prompts. For example, when asked to "give me a Miles Davis like Blues track with horns and a quartet" Suno generated two lyric-less tracks both named "Blue Note Quartet" that are clearly inspired by and are unlicensed derivative works of Miles Davis.

96. Even after these guardrails were implemented, similarly situated plaintiffs have been able to generate infringing works from Suno. *See Round Hill Music LP, et al. v. Suno, Inc.*, Case No. 3:26-CV-8507-RFL (N.D. Cal.), ECF 45 at ¶ 51 (filed Oct. 19, 2026) (discussing the infringing output from Suno lifting nearly verbatim the lyrics of "I Got You (I Feel Good)" by James Brown); *id.* at ¶ 55 (discussing how); *Gerencia 360 Music, Inc. v. Suno, Inc.*, Case No. 3:26-cv-09248-RFL (N.D. Cal.), ECF 41 at ¶ 48 (Filed Oct. 18, 2026) (discussing the infringing output from Suno based on English-translation lyrics of "Quince Besos" as performed by Cornelio Vega y Su Dinastia); *Isbell, et al. v. Suno, Inc., et al.*, 1:26-cv-14005, ECF 1, at ¶¶16-34 (D. Mass) (filed Aug. 31, 2026) (discussing infringing NIL output for several artists as well as indicators of Suno's classification of artists by name).

97. This is evidence that users can easily create unlicensed derivative works merely by submitting them themselves. And, under the terms of service, Suno can then take these user submissions and further train its models on them despite the guardrails.

98. Suno has thus structured its AI models to generate AI music designed to mirror the very copyrighted songs and NIL it trains on, for which the above and below alleged outputs are but a few examples. Suno has thereby created AI models that deliver outputs which are verbatim copies, strikingly similar, or at minimum substantially similar to the Works. Indeed, this complaint, in addition to other independent sources, has repeatedly identified instances where Suno's outputs are not merely in the style of existing works but contain verbatim or near-verbatim excerpts of pre-

[47] https://www.musicbusinessworldwide.com/suno-v6-ai-music-models-launch-in-partnership-with-wmg-bmg-and-believe/ (last visited Oct. 19, 2026).

existing songs, including outputs that imitate the voices of the artists performing on those songs, including Elvis.

99. These outputs include reproductions of melodies, lyrics, instrumentals, and even full passages indistinguishable from the originals, as well as the voice. In addition, Suno has output 'producer tags' which are an integral musical part of songs throughout the hip-hop and rap genres, and function as a type of signature for a producer, and as demonstrated above, entire songs using the voice of an artist.

100. Upon information and belief, Suno claims that its AI models can produce "radio-quality music, and has encouraged users to post their outputs to "platforms expressly designed to commercialize music."[48] Suno thus not only copied and ingested the Works into its AI models to train them, but also did so with the explicit purpose of imitating the expressive features of the Works in digital music files that serve as substitutes for and compete with the original Works. And indeed users are downloading and then reuploading competing works to sites such as YouTube and Instagram, as well as others: for example, Suno user @skytronic, who's landing page's background says "Skytronic Rockabilly Still Singing for the King"

[48] *UMG Recordings, Inc. et al v. Suno, Inc.*, et al., Case No. 1:24-cv-11611-FDS, DKT 277, at p. 27, ¶ 74 (D. Mass Aug. 25, 2026))




has a trove of Elvis NIL infringing Suno output (for example, Exh. B-4 ‘Rockin’ at Graceland’ is visible at the top of the user’s ‘Songs’ list as it was created less than one month ago), which are now on his YouTube[49] and Instagram accounts where he has almost 7,000 subscribers, with the outputs generating tens of thousands of cumulative views, and where others are *further* downloading the infringing Suno output.[50]

101. To be sure, a since-deleted X (formerly Twitter) post from C.C. Gong, a (now-former) principal of Suno’s lead investor, Menlo Ventures, all but confirmed that she saw the value in replacing streaming human-created music with that created by Suno. Said Gong: “What’s remarkable isn’t that Suno makes music generation easy. It’s that it’s changing the default relationship people have with music. Cultivation improves consumption. For decades, we listened to what artists (“record labels) [sic] released. Now, anyone can create exactly what they want to hear instantly. I’ve personally

---

[49] *See* Exhs. C-5 & C-5a (Suno output titled Living in Las Vegas on user’s Suno and YouTube pages).

[50] *See* https://www.youtube.com/watch?v=XW3seUhMMmo (user posted 4-hour mix of, upon information and belief, NIL infringing Suno output, and commenter on video states: “Wow have to certainly download this beautiful music, thanks for this music.”).

shifted most of my listening to Suno. I was so tired of Spotify giving me the same overplayed recommendations. When everyone can create, the catalog becomes infinite and music becomes more personalized. Instead of competing for mainstream hits, AI unlocks an ever-expanding long tail, meaning everyone can find their song, not just a song."

102. Plaintiffs in other cases have identified other examples of Suno's generation of outputs which infringe other's musical copyrights. For example, Plaintiffs in *UMG Recordings, Inc. et al. v. Suno, Inc.* No. 1:24-cv-11811 (D. Mass. June 24, 2024), ECF 1 (the "UMG Complaint"), at pp. 16-18, alleged that Suno's AI model generated music indistinguishable from Chuck Berry's classic "Johnny B. Goode" song, not just once, but twenty-seven (27) times. These Suno generated outputs appear to copy the essential and immediately recognizable melodies and arrangements of the original song.

103. The UMG Complaint also alleges that Suno's AI model generated ten (10) different outputs that resemble Bill Haley & His Comets' song "Rock Around the Clock." The Suno output contains four (4) lines at the beginning that are very similar to the original, with identical pitches and rhythm in many places. It also uses a melody later in the output on the phrase, "we're gonna rock around the clock tonight," which is virtually identical to the melody of the original. *Id.*, Paragraph 56 at 19.

104. The UMG Complaint further alleges Suno generated a song similar to Jerry Lee Lewis' song, "Great Balls of Fire," including ten (10) different outputs that contain a famous melody in this song. One such output includes the recognizable characteristic large vocal leap up to the word "great" in the line, "goodness, gracious, great balls of fire." This line also replicated the rhythm of the original and follows a similar melodic shape. *Id.*, Paragraph 59 at 21.

105. Suno's AI model also generated six (6) different outputs that contain portions of B.B. King's famous song, "The Thrill is Gone." The first phrase in the output, "the thrill is gone," uses identical pitches to those used in the third occurrence of this phrase in the original sound recording. The second phrase, "the thrill has gone away," is also very similar to the same phrase in the original. *Id.*, Paragraphs 60-61, at pp. 21-22.

106. Suno's AI model also generated eleven (11) additional outputs resembling "Sway."

*Id*., Paragraph 61 at p. 22.

107. In GEMA's case against Suno, mentioned above, GEMA's lawyers were able to reproduce songs like "Daddy Cool" by Boney M. and "Mambo No. 5" almost note for note by prompting Suno with the lyrics, a style, and a title.[51]

108. And now here, The Elvis and Raleigh plaintiffs have identified no less than 17 reproduction outputs of actual Works (some including multiple Works in one output), including Chubby Checker's "Let's Twist Again"; and Elvis' "Can't Help Falling in Love"; "Return To Sender"; and "(You're The) Devil In Disguise". These song files have been saved and logged and can be accessed through Exhibits A, D, and E. *See* ¶¶ 11, 13-14.

109. Elvis Presley Enterprises has further found and identified no less than 38 outputs that make use of Elvis' NIL and can be accessed through Exhibits A-C. *See* ¶¶ 11-12.

110. These are merely an illustrative sets of infringing outputs. Elvis Presley Enterprises discovered Suno's infringement of Elvis' NIL within the last month, and upon information and belief, there exists and have existed thousands of published infringing outputs or more. Not only has Suno generated infringing outputs and made them available to the public, on information and belief, Suno has taken steps that prevent rights holders from discovering the true extent of the infringing outputs by quietly removing lyric search (the ability for users to "search for lyrics…and find the song") less than one year after it was launched, and only weeks after news broke that Suno's lyric-generating AI model "ReMi" could, "with very little effort," be made to "generate 'full song' lyrics.

111. Suno has claimed that over 10 million people have already created digital music files using its AI services as of 2024.[52]

112. As of November 2025, Suno users were generating about 7 million songs **per day**, and as of February 26, 2026, as mentioned above, Shulman claimed that more than 100 million people

---

[51] Virginie Berger, Suno Loses Copyright Lawsuit To GEMA—AI Music Companies Should Worry, Forbes (Aug. 5, 2026), https://www.forbes.com/sites/virginieberger/2026/08/05/suno-lost-to-gema-why-the-ruling-should-worry-ai-music-companies/.

[52] Mikey Shulman, *Suno Has Raised $125 Million to Build a Future Where Anyone Can Make Music*, Suno Blog (May 21, 2024), https://suno.com/blog/fundraising-announcements-may-2024.

have used Suno, and that it has over 2 million paid subscribers and $300 million in annual revenue.[53] Upon information and belief, these digital music files have been released to the public, including on major streaming services, and thus compete with the NIL and copyrighted sound recordings that enabled their creation for which Suno did not seek or obtain permission to use. Moreover, and as discussed above, discovery will undoubtedly show that Suno created additional outputs which infringe upon Elvis' NIL, as well as all the Works, and are either verbatim copies of the Works, strikingly similar, or substantially similar.

### C. Harm to The Elvis and Raleigh Plaintiffs

113. Defendant's unlawful infringing conduct has caused and continues to cause harm to The Elvis and Raleigh Plaintiffs.

114. Despite giving him one, Elvis Presley needs no introduction. The rights to his iconic likeness, including his name, image, and voice, are some of the most, if not the most, valuable in the world, and licenses for its use are priced in accordance, if licensed at all. The Elvis Works in this case also contain some of the most iconic musical compositions of all time, as mentioned above, including "Can't Help Falling in Love"; "(You're The) Devil in Disguise"; and "Don't Be Cruel", among other hits.

115. The Works are world-famous compositions—the very kind of artistic expressions that the Copyright Act is designed to protect in fulfillment of the Constitutional mandate.

116. Without a single penny of remuneration—much less even a request for license—Defendant Suno, a massive, for-profit company has engaged in rampant commercial copying, unauthorized access, unauthorized and infringing outputting of Elvis' NIL and the Works, and removal of CMI. This has harmed The Elvis and Raleigh Plaintiffs by, *inter alia*, devaluing Elvis' likeness rights, their catalog, diverting compensation away from The Elvis and Raleigh Plaintiffs, precluding licensing opportunities, and divesting The Elvis and Raleigh Plaintiffs' commercial control over Elvis' NIL and these Works. In short, it infringes upon just about every one of The Elvis and Raleigh Plaintiffs' exclusive rights as the owner of Elvis' NIL or as the copyright owners of the

---

[53] https://www.forbes.com/sites/conormurray/2026/02/26/ai-music-platform-suno-reaches-2-million-subscribers-as-industry-backlash-grows/

Works.

117. Meanwhile, Defendant has amassed a fortune by circumventing the protections afforded to The Elvis Plaintiffs by the Copyright Act. Without the use of NIL such as Elvis', and/or works such as those Works owned, controlled, or represented by The Elvis and Raleigh Plaintiffs, Suno would have no business.

118. Thus, while simultaneously holding itself out to be a "responsible" company, Suno has been knowingly and intentionally committing willful NIL and copyright infringement from inception of its AI models.

### D. Fair Use Does Not Apply

119. As this Court in *Bartz v. Anthropic PBC*, 787 F. Supp. 3d. 1007, 1030-34 (N.D. Cal. June 23, 2025) ("*Bartz I*") determined following discovery, the practice of indefinite retention in a general-purpose archive is legally distinct from the narrower act of purchasing and scanning works solely to train a specific model. Suno has engaged in the same conduct, and the indefinite retention of unlicensed copies of copyrighted works, under *Bartz I*, does not constitute fair use. Building and maintaining a permanent stockpile of copyrighted material for open-ended future exploitation fails every factor of the fair-use analysis: the purpose is acquisitive rather than transformative; entire works are retained without limitation; and the unauthorized copies function as market substitutes, displacing sales and licenses on a one-to-one basis. This Court did not mince words when it rejected any suggestion that the Copyright Act contains a technology-sector exception to these well-established principles. *Id.* at 1022 ("Anthropic [another AI company] seems to believe that because some of the works it copied were sometimes used in training LLMs,[54] Anthropic was entitled to take for free all the works in the world and keep them forever with no further accounting. **There is no carveout, however, from the Copyright Act for AI companies.**") (emphasis added).

120. While in other cases for copyright infringement, Suno has waxed poetic about the necessity of progress and AI's value to society, there is simply no reason—other than expediency—to have that progress come at the cost of copyrights holders. Indeed, even if, accepting *arguendo*, the

[54] An LLM, or "Large Language Model," is a type of artificial intelligence program trained on massive amounts of text to recognize, translate, summarize, and generate human-like language.

procedural hurdles for ensuring proper licensing for the size of data needed for an effective AI model, there exists an entire universe of public domain and non-copyrighted materials with which to train the models. For example, literally every (formerly) copyrighted work under U.S. Copyright law written before 1931 (1926 for sound recordings) has now entered the public domain.

121. Furthermore, these "expediency" arguments completely falter when compared to the $5.4 billion valuation that Suno has garnered exploiting illicit copies of copyrighted works, including the Works. The Works were created over periods of dozens of years, and Suno, by its infringing conduct, is destroying the value of these works in a matter of a few years with only profit as its motive. By comparison, there are AI companies and collective rights organizations who seek permission and pay rights holders to create data sets for AI copying and training. Such companies include ElevenLabs, Musical AI, Symphonic, Soundverse, GEMA (through PLAI), GCX/Rightsify, and Troveo. Not only does this further undercut any "expediency" arguments, but it also directly demonstrates the harm The Elvis Plaintiffs faces to license with these forthright entities that license and pay for use of copyrighted music.

122. And, of course: "Fair use presupposes good faith and fair dealing." *Harper & Row Publishers, Inc. v. Nation Enters.,* 471 U.S. 539, 540 (1985). Just as in *Harper & Row*, the copying and permanent retention of the Works (in addition to the millions of other copyrighted works) was not the "incidental effect but the *intended purpose*." *Id.* (emphasis kept). Worse, the illicit copying, removal of CMI, and permanent retention of these copyrighted works *for the purpose* of regurgitating infringing copies thereof or to create songs to directly compete falls well outside of the enumerated fair use activities set forth in the Copyright Act, 17 U.S.C. section 107. There is simply nothing fair about a company using theft to build for purely commercial purposes a multi-billion-dollar business while those from which they steal receive nothing.

123. Suno has in fact lost on its fair use defense, in *GEMA v. Suno*, where the Munich Regional Court "assessed the US fair use position on training carried out in the US and rejected it, finding that outputs served the same purposes as the originals rather than a new one, and that the use

was commercial."[55]

124. These Performing Rights Organizations have also publicly made clear their position that Suno is not engaging in fair use.

125. BMI has stated that it:

> does not accept registrations for works that are generated entirely by AI using only text prompts, without meaningful human creative contribution. Even if multiple prompts are used to refine the output, the resulting work is considered fully AI-generated and is not currently eligible for copyright registration. This distinction ensures that BMI registrations reflect works with substantial human authorship, in alignment with current guidance from the U.S. Copyright Office.

Examples Include:

- Using platforms like Suno or Udio to enter text prompts and generate complete songs without adding original human-created lyrics, melodies, or instrumentation.
- Generating a full composition by repeatedly refining prompts in an AI music tool, without contributing any human-authored musical or lyrical elements.
- Creating a song entirely from AI-generated outputs, including lyrics, melody, harmony, and production, with no human editing or creative input beyond prompt selection.[56]

126. ASCAP, BMI, and SOCAN all recently stated "their firm position that companies ingesting and training models on copyrighted musical works without permission from, compensation for or credit to creators is not fair use, but theft."[57]

## V. Causes of Action

### First Cause of Action – Violations of The ELVIS Act

127. The Elvis and Raleigh Plaintiffs re-allege and incorporate by reference each and every allegation set forth in the preceding paragraphs as if set forth fully herein.

128. California's conflict of laws' authority, with respect to the right of publicity, primarily focuses upon the State where the person at issue passed away, under the applicable 'governmental

---

[55] https://www.musicbusinessworldwide.com/a-us-appeals-court-has-rejected-a-fair-use-defense-over-ai-training-what-does-it-mean-for-the-labels-fight-with-suno/.

[56] https://www.bmi.com/special/bmi-and-ai

[57] https://www.bmi.com/news/ascap-bmi-and-socan-announce-alignment-on-ai-registration-policies#:~:text=companies%20ingesting%20and%20training%20models%20on%20copyrighted%20musical%20works%20without%20permission%20from%2C%20compensation%20for%20or%20credit%20to%20creators%20is%20not%20fair%20use%2C%20but%20theft.

interest' analysis. Clearly, for all of the reasons discussed herein, Tennessee is the State with the greatest governmental interest in Elvis Presley and his likeness rights, and whose interests would be most impaired if its laws were not applied here. Elvis' name, image and likeness rights have been guarded and protected since before his death and at all times after his death continually.

129. Elvis Presley Enterprises owns and exclusively controls the rights to Elvis Presley's name, image, voice, and likeness.

130. Suno, knowingly without authorization or prior consent from Elvis Presley Enterprises, used and infringed upon the use of Elvis Presley's name, image, voice, and likeness for purposes of advertising products, merchandise, goods, or services, or for purposes of fundraising, solicitation of donations, purchases of products, merchandise, goods, or services in violation of T.C.A section 47-25-1105(a)(1).

131. Suno published, performed, distributed, transmitted, and/or otherwise made available to the public Elvis' voice and/or likeness, with knowledge that use of Elvis' voice and/or likeness was not authorized by Elvis Presley Enterprises in violation of T.C.A section 47-25-1105(a)(2).

132. Suno distributed, transmitted, and/or otherwise made available an algorithm, software, tool, or other technology, service, or device, the primary purpose or function of such algorithm, software, tool, or other technology, service, or device was the production of a particular identifiable individual's photograph, voice, or likeness, with knowledge that distributing, transmitting, or otherwise making available the photograph, voice, or likeness was not authorized in violation of T.C.A section 47-25-1105(a)(3), in this case Elvis Presley.

133. Suno violated these provision of the ELVIS Act by and through (a) scraping or otherwise obtaining copies of Elvis Presley's NIL from licensed streaming platforms and other online sources; (b) training its AI models on unlicensed and unauthorized copies of Elvis Presley's voice; (c) storing and reproducing copies of Elvis Presley's voice, including server copies in a permanent, all-purpose internal repository maintained for indefinite reproductions for future use; (d) indexing and cataloging Elvis Presley's likeness into its system; (e) creating unauthorized outputs of actual Works and other outputs simulating Elvis Presley's voice; (f) algorithmically recommending and promoting NIL infringing output to users through its 'Similar' and 'For You' recommendations,

based on unauthorized and infringing Elvis outputs; (g) processing his voice through its model-training pipeline; and (h) using Elvis' likeness and voice to promote purchases of its products and/or services by and through trading on the enduring fame and goodwill of the "King of Rock and Roll" to attract users, sell subscriptions, and promote its service, as well as publishing, performing, distributing, transmitting, and otherwise making available to the public Elvis likeness and voice, making available its algorithm, software, tools, and technological service for the primary purpose of producing identifiable individual's voices and likenesses, and indeed making available Elvis' voice and likeness, knowing it did not have authorization.

134. Suno knew it did not have authorization to use Elvis' likeness. Suno's ingestion, copying, training, and outputting of Elvis' voice and other NIL are all violations of the ELVIS Act. Each publication, performance, distribution, transmission, or otherwise making available of Elvis' voice and/or likeness is an infringement of Elvis Presley Enterprises' ownership of Elvis' NIL rights. Suno's distribution, transmission, and making available its algorithm, tools, technology and service for the primary function and purpose of infringing Elvis' voice and likeness renders it liable for its infringements under the ELVIS ACT.

135. None of these acts qualify as a fair use under the First Amendment to the United States Constitution. T.C.A. section 47-25-1107(a). The use of Elvis' name, photograph, voice, and/or likeness was not (1) In connection with any news, public affairs, or sports broadcast or account; (2) For purposes of comment, criticism, scholarship, satire, or parody; (3) A representation of the individual as the individual's self in an audiovisual work, as defined under 17 U.S.C. § 101; (4) Fleeting or incidental; nor (5) In an advertisement or commercial announcement for a work described above.

136. Elvis Presley Enterprises has been damaged by Defendant Suno's NIL infringement and is entitled to recover actual damages and Defendant Suno's profits under T.C.A. section 47-25-1106(d)(1) in an amount to be proven at trial, but believed to exceed $50 million. Profit or lack thereof by the unauthorized use or infringement shall not be a criteria for determining liability, per this section.

137. Elvis Presley Enterprises is entitled to treble damages and attorney fees for Suno's

knowing infringement of Elvis Presley's likeness rights under section 47-25-1106(d)(2) of the ELVIS Act, as Elvis was a member of the United States Army in active military serv2502ice of the United States from approximately March 1958 until March 1960, and is therefore a "member of the armed forces" under T.C.A. section 58-1-102, and his likeness rights were assigned to Elvis Presley Enterprises.

## SECOND CAUSE OF ACTION – VIOLATIONS OF THE TENNESSEE COMMON LAW RIGHT OF PUBLICITY

138. The Elvis and Raleigh Plaintiffs re-allege and incorporate by reference each and every allegation set forth in the preceding paragraphs as if set forth fully herein.

139. In addition, to the extent there exists further remedies available under Tennessee's common law right of publicity, such as punitive damages, Elvis Presley Enterprises asserts a cause of action for violations of those rights herein.

140. Tennessee recognizes a common law right of publicity. That right is a species of intangible personal property that does not end at death and is descendible and assignable.

141. Because Presley died domiciled in Tennessee, Tennessee law governs the existence, scope, discernibility, and ownership of his right of publicity.

142. Presley's right of publicity protects every distinctive and identifying element of his persona, including his name, photograph, likeness, and voice. As mentioned above, Presley's voice is among the most recognizable voices in the history of recorded music. It is distinctive and readily identifiable to the public in the United States and around the world, and its timbre, phrasing, vibrato, baritone register, vocal mannerisms, and styles are immediately associated with him and with no one else. At his death, Presley's voice had, and it continues to have, substantial commercial value.

143. Elvis Presley Enterprises owns and exclusively controls the rights to Elvis Presley's name, image, voice, and likeness.

144. Since Presley's death, Presley's estate, Elvis Presley Enterprises and its predecessors in interest, have continuously and actively exploited Presley's identity, including his voice, for commercial purposes. That exploitation has included, without limitation, the continuous commercial availability of sound recordings and audiovisual works in which Presley's voice is readily

identifiable; licensing of his voice and likeness for film, television, advertising, live and virtual entertainment, and merchandise, among other uses, as well as licensing the rights in connection with the operation of Graceland and related ventures around Tennessee and elsewhere.

145. Without Elvis Presley Enterprises' knowledge, authorization, or consent, Suno has appropriated Presley's voice and used it for its own commercial advantage. Suno has done so by, among other things:

a. copying and ingesting sound recordings embodying Presley's voice, and using them to train Suno's generative artificial intelligence models, specifically to enable those models to reproduce and imitate Presley's voice, even up to and including the latest model, Version 6;

b. offering and marketing to the public its AI products and services which generate new audio output imitating Presley's voice in response to user prompts, including prompts that name Presley or describe him, his style, or his songs, or even that simply spell his name in the lyrics;

c. producing, performing, distributing, transmitting, and making available to the public audio recordings that simulate Presley's voice so closely that ordinary listeners recognize the voice as Presley's and believe it is Presley's; and

d. using Presley's name, voice, and identity in user-facing interfaces to attract users, subscribers, and investors to Defendant's products.

146. The audio Suno generates and distributes is *not* a performance by Presley. It is a deliberate imitation/simulation of his voice, designed and trained to capture the distinctive qualities that make his voice as readily identifiable as his is. Suno intended its products and services to produce (and they do in fact produce) audio that the public identifies with Presley, sometimes even coupled with Works that the public identifies with Presley.

147. Suno's use of Presley's voice is commercial. Suno charges users subscription and usage fees for access to the products that generate the imitation/simulated audio. Suno also uses the ability to generate audio in the style and voice of famous artists, including Presley, to market their products and increase their value. Suno has captured, and continues to capture, revenue, profits, investment capital, and enterprise value attributable to its appropriation of Presley's voice and likeness.

148. Suno knew that Presley's voice is protected, and that Elvis Presley Enterprises owns and actively licenses the right to use it. Suno nonetheless acted without seeking or obtaining any license or consent from Elvis Presley Enterprises. Suno intentionally, maliciously, fraudulently, and/or recklessly infringed Elvis' NIL rights, and is liable to Elvis Presley Enterprises for punitive damages stemming from its conduct. Furthermore, as discussed above, Suno blatantly and intentionally misrepresented in papers filed with the District Court of Massachusetts that it does not take melodies from songs someone else wrote, (as well as creating new sound recordings of copyrighted lyrics without a license), and that it does not replicate and simulate artists' voices. As shown herein, that statement is intentionally and/or recklessly false. Furthermore, any limitation on the amount punitive damages owed to Elvis Presley Enterprises is inapplicable, as Suno, by and through its removal of CMI, concealed records containing material evidence with the purpose of wrongfully evading liability in this case.

149. Upon information and belief, Suno's infringements and misappropriations are ongoing. Each new model version, product release, and generated output that imitates Presley's voice is a separate and independent appropriation of his identity.

150. Therefore, Suno has violated Presley's common law right of publicity, owned and controlled by Elvis Presley Enterprises, under Tennessee law.

151. Specifically, Suno used Presley's identity, namely his distinctive voice and its imitation, along with his name where used in connection with his specific voice.

152. Presley's voice is readily identifiable as his, and Suno's use of it is recognizable to the public as an appropriation of his identity, and was used for Suno's own commercial advantage and benefit without consent or authorization by Elvis Presley Enterprises, causing injury to it.

153. Courts have long recognized that a celebrity's distinctive voice is an attribute of identity that the right of publicity protects, and that deliberate imitation of that voice for commercial purposes is actionable misappropriation. The Tennessee Legislature confirmed the same principle when it made explicit that every individual's property right in his identity includes his "voice," and defined that term to include a simulation of their voice.

154. Additionally, the legislature expressly noted that the statutory remedies are

"cumulative" and "in addition to any other provided for by law." The statute therefore preserves, and does not displace, Elvis Presley Enterprises' common law claim.

155. Further, this claim is not preempted by the Copyright Act. Elvis Presley Enterprises asserts Presley's right of publicity in his voice and identity, which are not within the subject matter of copyright. The claim is based on Suno's imitation and simulation of Presley's voice in new output Presley never recorded, nor did Elvis Presley Enterprises consent to the simulation of his voice to record, and on Suno's commercial exploitation of his identity. Those acts are qualitatively different from reproducing or distributing any particular copyrighted work. *See, e.g.*, *Midler*, 849 F.2d at 462.

156. Therefore, Elvis Presley Enterprises requests damages for its loss of licensing fees that Suno would have had to pay for the authorized use of Presley's voice; diminution of the value of Presley's right of publicity and of Elvis Presley Enterprises' exclusive licensing program; loss of control over the use, quality, and association of Presley's identity; dilution of the scarcity and goodwill of authentic Presley performances; and harm to its existing and prospective licensing relationships.

157. Suno has been unjustly enriched by its infringement, obtaining revenue, profits, and other benefits attributable to its taking and unauthorized use of Presley's voice, which Elvis Presley Enterprises requests as part of its damages.

158. Elvis Presley Enterprises is entitled to recover from Suno compensatory damages, and disgorgement of all profits Suno obtained that are attributable to their misappropriation of Presley's likeness and voice, in an amount to be proven at trial but believed to exceed $50 million, as well as punitive damages, and preliminary and permanent injunctive relief prohibiting Suno from using Elvis' voice and/or likeness.

## THIRD CAUSE OF ACTION – DIRECT COPYRIGHT INFRINGEMENT

159. The Elvis and Raleigh Plaintiffs re-allege and incorporate by reference each and every allegation set forth in the preceding paragraphs as if set forth fully herein.

160. The Elvis and Raleigh Plaintiffs own or exclusively control valid, subsisting copyrights in the Works identified in Exhibit F.

161. Suno, without authorization from The Elvis or Raleigh Plaintiffs, reproduced The

Works by: (a) scraping or otherwise obtaining copies from licensed streaming platforms and other online sources, including through the use of circumvention tools and services provided by Bright Data; (b) assembling those copies into training datasets; (c) storing and reproducing those copies, including server copies in a permanent, all-purpose internal repository maintained for indefinite reproductions for future use; (d) unlawfully reproducing the Works at issue here through the making of permanent server copies; and (e) processing those datasets through its model-training pipeline. Each such act independently violated The Elvis and Raleigh Plaintiffs' exclusive rights under 17 U.S.C. sections 106(1) and 106(2).

162. None of these acts qualifies as a fair use. As the *Bartz I* court held, the indefinite retention of copyrighted works in a general-purpose repository for uncommitted future exploitation is not transformative and fails every factor of the fair-use test. The same reasoning applies to Suno's accumulation of copyrighted recordings for AI training at commercial scale without any license or compensating benefit to rights holders.

163. Defendant's infringement in these regards was willful. At all times relevant to this Complaint, Defendant had actual knowledge that it was making copies of the Works without license or payment.

164. Furthermore, Suno, without authorization from The Elvis or Raleigh Plaintiffs, has separately infringed and continues to infringe the Works each time Suno's AI music generator reproduces, displays, performs, or prepares a derivative work based upon the copyrighted Works. These infringing outputs include songs created in response to user prompts that are substantially similar, if not strikingly similar to, the Works and unlicensed derivative works that incorporate, without a license, the original, copyrighted elements of the Works.

165. Suno's leaked code shows that it deliberately enabled "stem splitting" *i.e.* breaking up sound recordings of musical compositions into separate tracks for vocals, drums, and the various instruments played. Further, Suno purportedly additionally deliberately sought out *a cappella* versions of the songs so that it could more faithfully create vocals based upon the infringed Works and further train its AI model on multiple iterations of the Works, especially with regard to the lyrics of the song so that its model could "create" (*i.e.* regurgitate infringing derivative works) lyrics based

thereupon.

166. In addition to using "stem splitting," Suno also used a training code that uses related recordings together. The Suno code puts a cover recording followed by the "main" (original) recording of the same song when creating a training data instance. That gives the Suno model the cover as reference audio while it learns to predict the main recording. In this manner, Suno uses multiple versions of a song during its AI model training. This could be used, for example, to take a copyrighted acoustic performance scraped from the internet by Suno without permission and generate a full-band version or turn a ballad into a dance track.

167. Each infringing output by Suno constitutes an independent violation of The Elvis and Raleigh Plaintiffs' exclusive rights to reproduce (section 106(1)), prepare derivative works (section 106(2)), distribute copies (section 106(3)), publicly perform (section 106(4), and publicly display (section 106(5)) the Works.

168. Suno's output-stage infringement is willful. While Suno advertises that it enacted safeguards to prevent copying of copyrighted elements, these safeguards are easily overcome as discussed fully herein.

169. The Elvis and Raleigh Plaintiffs have been damaged by Defendant Suno's infringement and are entitled to recover actual damages and Defendant Suno's profits under 17 U.S.C. section 504(b), or in the alternative, statutory damages of up to $150,000 per Work willfully infringed under 17 U.S.C. section 504(c). The Elvis and Raleigh Plaintiffs identify 859 Works in Exhibit F, meaning that the total statutory damages sought in this case is $128,850,000.

## Fourth Cause Of Action – Circumvention of Protection Measures, 17 U.S.C. § 1201

170. The Elvis and Raleigh Plaintiffs re-allege and incorporate by reference each and every allegation set forth in the preceding paragraphs as if set forth fully herein.

171. The Works are hosted on licensed streaming and lyrics platforms that deploy technological measures to control access to those Works. These measures include, without limitation: user-authentication requirements (login credentials and session tokens), paid-subscription paywalls, CAPTCHA and bot-detection challenges, IP-based rate limiting, JavaScript rendering requirements, and Terms of Service and robots.txt directives restricting automated access. These measures

effectively control access to The Works within the meaning of 17 U.S.C. section 1201(a)(3)(B).

172. Suno violated 17 U.S.C. section 1201(a)(1) by circumventing—directly and through the use of Bright Data's tools and services—technological measures that effectively controlled access to The Works on licensed streaming and lyrics platforms, thereby obtaining unauthorized access to and copies of those Works for use in training its AI model.

173. Defendant's violations of section 1201 was willful and conducted for commercial advantage and financial gain.

174. The Elvis and Raleigh Plaintiffs have been damaged by Defendant's violations and are entitled to remedies under 17 U.S.C. section 1203, including injunctive relief, actual damages or statutory damages of up to $2,500 per violation under section 1203(c)(3)(A), costs, and attorneys' fees. There are 859 Works on Exhibit F for a total of $2,147,500.

## FIFTH CAUSE OF ACTION – REMOVAL OR ALTERATION OF CMI, 17 U.S.C. § 1202

175. The Elvis and Raleigh Plaintiffs re-allege and incorporate by reference each and every allegation set forth in the preceding paragraphs as if set forth fully herein.

176. The Works, as displayed on licensed lyrics platforms and streaming services, bear copyright management information within the meaning of 17 U.S.C. section 1202(c), including: the title of the composition, the identity of the songwriter(s) and/or composer(s), the identity of the copyright owner and/or publisher (The Elvis and Raleigh Plaintiffs or their affiliates), and other identifying data such as ISRC codes and copyright notices.

177. Defendant intentionally removed or altered CMI from The Works during its data-cleaning pipeline, in violation of 17 U.S.C. section 1202(b)(1). Upon information and belief, Defendant's engineers selected a data-extraction methodology that aggressively stripped authorship and ownership metadata, choosing it over available alternatives that would have preserved that information.

178. Defendant knew, or had reasonable grounds to know, that CMI is vital to protecting The Elvis Plaintiffs' copyright interests, and Elvis' NIL interests, and that its removal and omission of CMI would induce, enable, facilitate, and/or conceal infringement. Suno was aware that its AI models memorize the training-data content. It follows that stripping CMI during training would

conceal Suno's infringement. This satisfies the "double scienter" requirement established in *Stevens v. Corelogic, Inc.*, 899 F.3d 666, 671, 673 (9th Cir. 2018); *see Concord Music Group, Inc. v. Anthropic PBC*, No. 5:24-cv-03811-EKL, 2025 WL 4808984 *4-5 (N.D. Cal. Oct. 6, 2025) (holding similar allegations sufficient at the pleading stage, citing *Kadrey v. Meta Platforms, Inc.*, 2025 WL 744032 (N.D. Cal. Mar. 7, 2025), and *Mango v. BuzzFeed, Inc.*, 970 F.3d 167, 173 (2d Cir. 2020)).

179. Defendant's violations of section 1202 were willful and conducted for commercial advantage.

180. The Elvis and Raleigh Plaintiffs have been damaged by Defendant's violations and are entitled to remedies under 17 U.S.C. section 1203, including injunctive relief, actual damages or statutory damages of up to $25,000 per violation under section 1203(c)(3)(B), costs, and attorneys' fees. Therefore, The Elvis Plaintiffs seek a total of $21,475,000 for their 859 Works listed in Exhibit F.

## PRAYER FOR RELIEF

WHEREFORE, The Elvis and Raleigh Plaintiffs respectfully request that this Court enter judgment against Defendant Suno and grant the following relief:

(a) A declaration that Defendant's use of Elvis' NIL was unauthorized, infringing, and in violation of the ELVIS Act, and that Defendant is liable for this unauthorized use pursuant to Tennessee Code section 47-25-1105, and/or that Defendant is liable for these violations under Tennessee common law;

(b) A declaration that Defendant committed willful copyright infringement of The Works in violation of 17 U.S.C. sections 106 and 501;

(c) A declaration that Defendant has violated 17 U.S.C. section 1201 by circumventing, technological measures effectively controlling access to The Works;

(d) A declaration that Defendant has violated 17 U.S.C. section 1202 by intentionally removing or altering copyright management information from The Works and distributing copies with such information removed, with knowledge or reasonable grounds to know that doing so would induce, enable, facilitate, or conceal infringement;

(e) A permanent injunction prohibiting Defendant, and its officers, agents, employees, successors, and assigns, from further infringing The Works or engaging in any of the unlawful conduct alleged herein, and an injunction on such terms as the Court may deem reasonable to prevent or restrain the unauthorized use of Elvis Presley Enterprise's rights in Elvis' name, image, voice, and likeness, including the confiscation of all unauthorized items and seizure of all instrumentalities used in connection with the violation of these rights;

(f) An order directing Defendant to deliver for impoundment or destruction all unauthorized copies of The Works in its possession, custody, or control—including copies retained in training datasets, internal repositories, model weights, and server infrastructure—pursuant to 17 U.S.C. section 503(b);

(g) An order directing Defendant to deliver for impoundment, on such terms as the Court may deem reasonable, of all materials or any part thereof claimed to have been made or used in violation of Elvis Presley Enterprise's rights in Elvis' likeness, and enjoinment of the use of all plates, molds, matrices, masters, tapes, memory chips and drives, film negatives, or other articles or methods by means of which such materials may be reproduced.

(h) An order directing the destruction or other reasonable disposition of all materials found to have been made or used in violation of Elvis Presley Enterprise's rights, and of all plates, molds, matrices, masters, tapes, memory chips and drives, film negatives, or other articles by means of which such materials may be reproduced.

(i) An order requiring Defendant to provide a complete accounting of all training data, scraping activities, and datasets involving The Works;

(j) An award of actual damages suffered by Elvis Presley Enterprises, and any profits that are attributable to such NIL use/infringement which are not taken into account in computing the actual damages, pursuant to T.C.A. section 47-25-1106(d)(1), as well as treble damages, pursuant to 47-25-1106(d)(2), and any additional relief available under Tennessee Common law, including punitive damages due to the intentional, malicious, fraudulent and/or reckless conduct of Suno;

(k) An award of actual damages suffered by The Elvis and Raleigh Plaintiffs and disgorgement of Defendant's profits attributable to the infringement, pursuant to 17 U.S.C. section

504(b); or, in the alternative, an award of statutory damages of up to $150,000 per Work willfully infringed, pursuant to 17 U.S.C. section 504(c);

(l) An award of actual damages or statutory damages of up to $2,500 per violation of 17 U.S.C. section 1201 and up to $25,000 per violation of section 1202, pursuant to 17 U.S.C. section 1203(c);

(m) An award of Plaintiffs' reasonable attorneys' fees and costs of suit, pursuant to 17 U.S.C. sections 505 and 1203(b)(4)-(5) and/or T.C.A. section 47-25-1106(d)(2);

(n) Pre-judgment and post-judgment interest at the maximum lawful rate; and

(o) Such other and further relief as this Court deems just and equitable.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all issues so triable, pursuant to Federal Rule of Civil Procedure 38(b).

Dated: November 6, 2026

*/s/ Richard S. Busch*

**ADAMS & REESE, LLP**
Richard S. Busch (SBN 319881)
Mark L. Block (SBN 115457)
David Niemierzycki (*pro hac vice* forthcoming)
Andrew H. "Drew" Davis (*pro hac vice* forthcoming)
1600 West End Ave., Suite 1400
Nashville, TN 37203
Tel: (615) 259-1450
Fax: (615) 259-1470
richard.busch@arlaw.com
mark.block@arlaw.com
david.niemierzycki@arlaw.com
drew.davis@arlaw.com

**SKAGGS FAUCETTE LLP**
Jeffrey E. Faucette (SBN 193066)
Martin R. Glick (SBN 40187)
505 Montgomery Street, 11th Floor
San Francisco, CA 94111
Tel: (415) 874-3181
Fax: (888) 980- 6547
jeff@skaggsfaucette.com
marty@skaggsfaucette.com

*Attorneys for Elvis Presley Enterprises, LLC; ABG EPE IP LLC; The Luigi Creatore Trust and Claire Creatore and Stephen Chapman as trustees; The Susan T. Aberbach Revocable Trust and Susan T. Aberbach as trustee; The Decedents Exempt Trust Created Under The Anne-Rachel Aberbach Family Trust and Steven Lee as trustee; Jason Simeon Aberbach; Abilene Music LLC; Karen Zimmerman; Janice Macdowell; Helene Kaye; Karen Kaye Lee; Steven Baum; Melissa Ferrick; Lori Zimmerman; and Raleigh Music Publishing LLC*